CHARLES M. HOWELL, ADMINISTRATOR, ESTATE OF BRUCE DODSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 7382, 24464.   Promulgated December 17, 1930.

758

*Daniel V. Howell, Esq.*, and *Charles M. Howell, Esq.*, for the petitioner.

*P. M. Clark, Esq.*, for the respondent.

768

OPINION.

MORRIS: The first allegation of error pertaining to the respondent's action in adding to gross income for the several years in question various amounts, representing commissions alleged to have been received and, therefore, taxable to Dodson, raises the question whether Dodson actually or constructively received the entire 30 per cent which he was authorized to deduct from the total premiums deposited by subscribers or whether he only received, for tax purposes, 15 per cent in 1918 and 20 per cent in the succeeding years. The respondent contends that the entire 30 per cent was either actually, or at least constructively, Dodson's income in the years when paid by the subscribers. The petitioner contends that Dodson received, for tax purposes, only approximately 15 per cent of premiums in 1918 and 20 per cent in the succeeding years, and that the remaining 15 per cent for 1918 and 10 per cent for the years thereafter were neither actually nor constructively received by Dodson, because

of the state of the reserves of the Exchange in those years, requirements of the State insurance commissioners in which the Exchange was licensed, and because of Dodson's agreement to withdraw only certain amounts in those years. A brief review of the evidence offered in support of the contentions urged by the petitioner will be very helpful.

The Exchange was engaged in the insurance business, mutual in character. It sold workmen's compensation and liability insurance to its subscribers and it was licensed to do business in a great many States throughout the United States, including the District of Columbia. Dodson, as its manager, received from each subscriber of the Exchange a power of attorney authorizing him to exchange indemnity with other subscribers, and in consideration of Dodson defraying all expenses incident to conducting the Exchange, " except taxes, legal, preventive and advisory committee expense, and including compensation for his services," he was to receive " thirty per cent of all moneys received by him for credit to our [subscriber's] account." The entire premium was charged to the subscriber in the books of account and was divided, for accounting purposes, into three separate parts, 65 per cent of which was credited to the so-called underwriting account, which was the reverse side of the subscriber's account, 5 per cent to excess reserve No. 1 account and 30 per cent to an account entitled excess reserve No. 2. It is this latter amount which is in issue here.

During the years 1912 to 1915, inclusive, Dodson drew the entire 30 per cent provided for in subscriber's powers of attorney annually, but because of the state of the reserve accounts and the requirements of the State insurance departments and an agreement of Dodson with the advisory committee he was paid only approximately 15 per cent in 1918 and 20 per cent in the succeeding years. It is the difference between 15 per cent and 30 per cent for 1918, and 20 per cent and 30 per cent for the succeeding years, or 15 per cent for 1918 and 10 per cent for the succeeding years, which the respondent contends is taxable in the years in which the premiums were received by the Exchange. Let us examine the facts, therefore, respecting the failure or inability of the Exchange to pay the entire 30 per cent of premiums to Dodson in the years in which they were received.

To begin with it was an established policy of the Exchange to declare and pay or credit to its subscribers an amount of savings which, during the earlier years of its existence, amounted to 25 per cent of premiums in 1918 and later years 20 per cent. Upon the expiration of a subscriber's policy the said subscriber automatically received 20 per cent, either in cash or by way of credit upon the renewal premiums thereafter due. If the policyholder closed his account a check was sent to him for his savings at that time.

In or about 1917, and during the years subsequent thereto, the question of administration expenses to be paid to Dodson was raised at meetings of the advisory committee in their discussion of the requirements of various States, at which it was shown to the committee that the deposits, less 20 per cent savings heretofore referred to, would not be sufficient to meet reserve requirements. Thereupon, Dodson agreed that he would not take his full commission but would limit himself to that part necessary to pay the actual expenses of the Exchange and that the remainder would be left on deposit for a period of three years, after which if none of the amount so remaining was required to maintain the reserves it would be withdrawn.

In 1916 the Pennsylvania Insurance Department commenced a series of supervisory communications touching upon rates, dividends to subscribers, and management expenses. On January 3, 1917, the Exchange received a communication from that department stating that the insurance commissioner recognized · that the management expenses of the Exchange amounted to 30 per cent of premium income, exclusive of claim adjustment cost, and at the same time the said commissioner " directed " that the dividends of the Exchange " shall not exceed 12½ per cent." Thereafter, on January 27, 1917, Dodson subscribed and swore to a communication which was filed with the Pennsylvania Insurance Department stating " * * * that not more than fifteen per cent (15%) of the deposit premiums received will be used for expenses during the year 1917 * * *." Whereupon, the Pennsylvania Insurance Department advised the Exchange on February 28, 1917, that a sworn statement having been filed to the effect that the " contract " between the Exchange and the attorney in fact limited the management expenses for 1917 to 15 per cent of premiums, and in view of said " modified contract " the amount of dividends paid to subscribers " shall not exceed 25 per cent " instead of 12½ per cent as theretofore directed. Again, on November 2, 1917, the Pennsylvania Insurance Department, having held a public hearing on October 19, advised the Exchange that the compensation insurance rates approved for stock companies would be approved for the Exchange, provided that no dividend should be paid upon Pennsylvania Workmen's Compensation policies expiring after December 31, 1917, " until further audit." Thereafter, on November 27, 1917, Dodson filed a sworn statement with the Pennsylvania Insurance Department stating " * * * that not more than twenty per cent (20%) of the deposit premiums received on workmen's compensation contracts will be used for expenses during the year 1918, * * *." Thereafter, on December 3, 1917, the Pennsylvania Insurance Department, referring to the sworn statement just quoted from, advised the Exchange that " a dividend to policyholders of not to exceed 20 per cent of premiums

will therefore be approved upon compensation policies effective in 1918." On October 30, 1919, the Pennsylvania Insurance Department approved the renewal rates of the Exchange, provided that no dividend in excess of 20 per cent of earned premiums should be paid upon any policy expiring on or before December 31, 1920, and provided further "that the agreement of the attorney in fact with the subscribers, governing the expenses chargeable to the Exchange, which agreement was dated November 27, 1917, and is on file with the Insurance Department of Pennsylvania, shall remain in full force and effect." On March 8, 1922, the Insurance Department of Pennsylvania directed the Exchange to pay no dividends nor make any distribution of surplus to the policyholders without written approval of the insurance commissioner. On March 23, 1922, Dodson advised the Pennsylvania Insurance Department that "the manager of the Casualty Recriprocal Exchange hereby certifies that the agreement dated November 27, 1917, as on file with the Insurance Department of Pennsylvania, is and shall remain in full force and effect."

The record shows that taking the admitted assets and deducting therefrom statutory requirements for loss and unearned premium reserves and reserve necessary to pay accrued savings, etc., and also the amount of excess reserve No. 2, or Dodon's full 30 per cent of premiums, would have resulted in a deficit of $169,826.04, $236,649.91, $238,545.68, $369,834.89, $314,157.30, and $316,362.20 for the years 1918 to 1923, respectively.

Did the receipt of premiums and the setting aside of 30 per cent thereof in the books of account of the Exchange constitute an actual receipt of said 30 per cent by Dodson? This question we believe should be answered in the negative. The power of attorney issued to Dodson allowed him great latitude and discretion in the administration of the Exchange in so far as the arrangement and cancellation of contracts, the settlement of losses, and receipt of moneys were concerned, but beyond there he was practically powerless to act except under the direct supervision of the advisory committee provided for in the same power of attorney. The advisory committee was selected by the subscribers and its members were empowered by the subscribers to adopt such rules and regulations, not inconsistent with the powers already delegated to Dodson, "for the conduct of Reciprocal Exchange and our said attorney as they shall deem best." The power of attorney provided that the funds of subscribers should be deposited in banks or invested in securities approved by the advisory committee, and, furthermore, that disbursements from said funds should be by check, signed by the attorney, and countersigned by a member of the advisory committee or by a bank or trust company approved by said committee. Thus it will be seen that the handling

of funds of the Exchange and disbursement thereof were under the rigid supervision and control of the advisory committee. If the advisory committee, therefore, with its supervisory power over the funds of the Exchange and the conduct of Dodson as attorney for the subscribers, considered that the best interests of the subscribers demanded that the funds of the Exchange be held intact and should not be distributed, it is clear that a payment of premiums to the Exchange could not possibly have constituted a payment of 30 per cent thereof to Dodson. The power of attorney provided unqualifiedly that Dodson was authorized to deduct 30 per cent of all moneys received by him for credit to the subscriber's account, but a mere power to deduct the percentage provided for does not necessarily empower him to withdraw the funds and convert them to his own account where the business of the Exchange and the interests of the subscribers may be thereby jeopardized. Therefore, we do not believe that a payment of premiums to the Exchange *ipso facto* became an actual payment of 30 per cent thereof to Dodson.

If payment of premiums to the Exchange did not constitute an actual receipt of 30 per cent thereof by Dodson, did it constitute a constructive receipt within the meaning of the decided cases, that is, bearing in mind that Dodson was on a cash receipts and disbursements basis, could he, had he wished to, have withdrawn the entire 30 per cent of premiums during the taxable years?

As we said in *John A. Brander*, 3 B. T. A. 231, in speaking of the doctrine of constructive receipt:

* * * This doctrine, as we have made clear in several appeals, is not to be applied lightly, but only in situations where it is clearly justifiable. When taxable income is consistently computed by a citizen on the basis of actual receipts, a method which the law expressly gives him the right to use, he is not to be defeated in his *bona fide* selection of this method by " construing " that to be received of which in truth he has not had the use and enjoyment. Constructive receipt is an artificial concept which must be sparingly applied, lest it become a means for taxing something other than income and thus violating the Constitution itself. Doubtless, however, there are clear cases of constructive receipt, such, for example, as that of the bond owner who chooses not to cash his coupon but to permit it to remain uncut in the possession of another. * * *

In *H. C. Couch*, 1 B. T. A. 103, the taxpayer was the president of a corporation, the board of directors of which authorized payment to him, as its president, of a salary of $7,500 for 1920, and there was credited to him in the books of account of the company the full amount so authorized. The taxpayer actually received as salary during 1920 the sum of $4,125. In December of 1920, before the books of the corporation were finally closed for that year, the company, being in straitened financial circumstances, the taxpayer agreed not to withdraw the sum of $3,375, the balance of the author-

ızed salary which had not been paid to him. The company charged to its operating expenses the entire $7,500 in 1920, but in December of the same year, before its books were closed, an adjustment was made to the extent of $3,375, and operating expenses were credited on the books of the corporation. The company filed an information return on Form 1099, showing that it had paid the taxpayer a salary of $7,500. The taxpayer's individual return showed that he received the sum of $3,475 as salary for that year. The Board there, in finding that the taxpayer's salary for services rendered in 1920 was the sum of $4,125 instead of $7,500, said in part as follows:

This Arkansas Light & Power Co. was a small corporation whose stock was held by comparatively few persons, and this taxpayer was the dominating influence in the management of its affairs. He appears to have carried upon himself at all times the responsibility for the successful conduct of the corporation's business and to have had such an interest in the corporation making a good financial showing that he was willing to and did forego his right to such salary compensation as had been once agreed that he should receive in order that the financial statements of the company might make a better showing.

Salary arrangements between corporations and their principal stockholders and managers in cases like this one, where the manager is expected by his associates to protect the interests and the future prospects of the company even at a sacrifice to himself, are and must be at all times subject to such modifications as may be made by agreement from time to time; and it appears to us that the arrangement entered into by this taxpayer and this corporation in the month of December, 1920, clearly shows an intent on the part of both sides to modify the prior existing agreements in regard to this taxpayer's compensation, and that such modification was actually made in good faith and the accounts of the company adjusted accordingly.

In *A. L. Englander*, 1 B. T. A. 760, the taxpayer's salary, as president and general manager of the Englander Motor Co., was fixed at the beginning of each year by agreement between himself and the board of directors, but it was agreed he would draw on a salary account only as funds were actually available therefor. The corporation credited the taxpayer there with the amounts of $30,000, $20,000, and $15,833.33 for the years 1919, 1920, and 1921, but the taxpayer actually drew only $15,288.85, $11,571.69, and $11,200, respectively. The amounts actually credited, however, were deducted from its gross income in the computation of its tax for those years. The corporation's books were kept on the accrual basis and those of the taxpayer upon the cash receipts and disbursements basis. In holding that the amounts credited in excess of the amounts actually received by the taxpayer were not taxable to him in the years in which credited the Board said there:

From the evidence adduced at the hearing, the Board is of the opinion that the credits to the taxpayer on the books of the corporation for undrawn salary balances were never available for his use. The taxpayer had agreed to draw only such part of his stated salary as could be paid by the corporation without

interfering with its operations or impairing its credit. Although not insolvent on the face of its books, the corporation had large expenses and very heavy immediate and contingent liabilities, and, at no time during the years in question, did it have funds sufficient to permit payment of the amounts due the taxpayer without serious embarrassment and danger of bankruptcy.

The rule is well established by the decisions of this Board that mere book entries crediting officers or employees with amounts of undrawn salaries do not necessarily establish the taxability of said amounts. *Walter L. Hopkins*, 2 B. T. A. 549; *A. Bluthenthal*, 1 B. T. A. 173; *J. M. Edmunds*, 1 B. T. A. 998; *Nicholas J. Maisel, Jr.*, 2 B. T. A. 66; and *Thomas Bemis*, 2 B. T. A. 255.

The Exchange was unquestionably faced with several rather difficult financial problems during the years here in controversy. The State of Pennsylvania was constantly hounding it with instructions as to the amounts of dividends it could pay to its subscribers and as to the amounts of expenses it could disburse to its manager. It was faced with the problem of continuing the payment of 30 per cent of premiums to Dodson, which would have necessitated the discontinuance of a portion or all dividends to its subscribers and, therefore, causing it to deviate from its well settled policy which, no doubt, would have reacted very unfavorably to the Exchange. Dodson had agreed with the advisory committee that he would not take his full commission, but would withdraw only enough to pay the actual expenses of the Exchange, and that the remainder would be left on deposit for a period of time, after which, it would be withdrawn if not required to maintain reserve requirements of the States. Simply because Dodson's powers granted him by the subscribers were extremely broad it can not be said that his agreement with the advisory committee could have been discarded at any time at Dodson's pleasure. The advisory committee, as we have already stated, and as can be plainly read from the power of attorney granted Dodson, held the controlling hand in all matters of finances and could call Dodson to account for his actions in such matters at any time that they felt that the interests of the subscribers and of the Exchange were threatened. The State of Pennsylvania Insurance Department was satisfied that there was an agreement restricting the amounts payable to the manager for the expenses of the Exchange, which is clearly evidenced by the fact that that department refers to the agreement between Dodson and the Exchange limiting the management expenses as a " contract."

It is very evident from the various communications received by the Exchange and Dodson from the Pennsylvania Insurance Department during the taxable years, touching upon the question of dividends to subscribers and managerial expenses to Dodson, that had instructions of the said department not been strictly adhered

to the Exchange's license would have been revoked in the State of Pennsylvania where a large portion of its business was done. That department dictated the amount of dividends which might be paid during the years here in controversy and the Exchange, realizing its long settled policy of paying a dividend of 20 per cent, felt that the interest of the Exchange would suffer should those dividends be reduced. Therefore, in preference to reducing the dividends, Dodson reduced the managerial expenses, thereby permitting a continuation of dividends at the rate of 20 per cent per annum.

It has been satisfactorily shown that had the Exchange set aside the statutory reserves, the reserve necessary to pay accrued savings and at the same time paid Dodson the full 30 per cent of premiums, a very considerable deficit would have occurred during the years 1918 to 1923, which we are satisfied would not have been tolerated for one moment by any of the States in which the Exchange was licensed to do business.

We are of the opinion that the amounts in excess of 15 per cent of premiums for 1918 and 20 per cent in the succeeding years were neither actually nor constructively received by Dodson and that the respondent was in error in so holding.

The second allegation of error is that the statute of limitations has run against the assessment and collection of the proposed deficiencies for the years 1918 and 1919. Dodson filed his individual income-tax return for the calendar years 1918 and 1919 on or about May 5, 1919, and April 15, 1920, respectively. In January, 1924, he entered into an unlimited consent in writing, pursuant to the provisions of section 250 of the Revenue Act of 1921, agreeing to a later determination, assessment and collection of the amount of tax due for 1918, and in March, 1924, he entered into a further consent with respect to the same year extending the time for the determination, assessment and collection of the tax for a period of one year after the expiration of the statutory period or said period as extended by any waivers already filed with the Bureau. In January, 1925, he entered into a further consent in writing waiving the period of limitations for the making of the assessment of taxes due for 1918 and 1919 until December 31, 1925, such waivers to expire upon that date " except that if a notice of a deficiency in tax is sent to said taxpayer by registered mail before said date and (1) no appeal is filed therefrom with the United States Board of Tax Appeals then said date shall be extended sixty days, or (2) if an appeal is filed with said Board then said date shall be extended by the number of days between the date of mailing of said notice of deficiency and the date of final decision by said Board."

The notice of deficiency with respect to the years 1918 and 1919 was mailed to the petitioner under date of July 27, 1925, and the

petitioner duly appealed from the determination set forth therein by the filing of a petition with this Board on September 22, 1925.

Dodson having filed his individual income-tax return for 1918 on May 5, 1919, and his 1919 return on April 15, 1920, the periods of limitation with respect thereto did not expire until May 5, 1924, and April 15, 1925, respectively. The two consents in writing entered into in January and March of 1924 were both prior to the expiration of the period of limitations with respect to 1918 and effected an extension of the period for the determination, assessment and collection of the tax for that year until May 5, 1925. Prior to May 5, 1925, to wit, in January, 1925, a further consent was entered into for both the taxable years 1918 and 1919 effecting an extension of the statutory period until December 31, 1925, as to both years with the exception hereinabove provided for. The notice of deficiency was mailed prior to December 31, 1925, to wit, on July 27, 1925, the extended date provided for in the final waiver hereinabove, and an appeal was duly filed.

Petitioner's counsel contends that the two waivers dated prior to the passage of the Revenue Act of 1924 terminated upon the passage of that act under the authority of *Toxaway Mills* v. *United States*, 61 Ct. Cls. 363, and that, therefore, under *Russell* v. *United States*, 278 U. S. 181, the final waiver of January 26, 1925, became inoperative because given after the statute had already run.

We have read the opinion of the Court of Claims, cited by counsel for the petitioner as authority for the premise which he adopts, and fail to find any support for the contention made. On similar statements of fact in *Sunshine Cloak & Suit Co.*, 10 B. T. A. 971; *Alliance Machine Co.*, 12 B. T. A. 1156, and *Albertina Baur*, 14 B. T. A. 933, we have held that the statutory period had not run, and we must so hold here. If the petitioner's contention as to the first two consents were sound, the consent of January 26, 1925, is effective. *Wells Brothers Co.*, 16 B. T. A. 79.

With respect to the third and fourth issues herein, the petitioner complains that the attempted assessment is no assessment at all, that there is no such person or entity as " The Estate of Bruce Dodson," that until an administrator had been appointed there was no representative of the deceased against whom an assessment could be made, that there was no administrator when the deficiency notice was mailed, and that there must be a valid assessment as a prerequisite to tax liability. As we understand it, the petitioner's complaint is directed to the fact that the deficiency notice in cause numbered 24464 was addressed to the " Estate of Bruce Dodson " after the death of Dodson and before the appointment of an administrator, to wit, on December 22, 1926, Dodson having died August 22, 1926,

and Howell not having been appointed administrator of his estate until March 1, 1927.

Section 281 of the Revenue Act of 1926 provides in part as follows:

SEC. 281. (a) Upon notice to the Commissioner that any person is acting in a fiduciary capacity such fiduciary shall assume the powers, rights, duties, and privileges of the taxpayer in respect of a tax imposed by this title or by prior income, excess-profits, or war-profits tax Act (except as otherwise specifically provided and except that the tax shall be collected from the estate of the taxpayer), until notice is given that the fiduciary capacity has terminated.

\* \* \* \* \* \* \*

(c) Notice under subdivision (a) or (b) shall be given in accordance with regulations prescribed by the Commissioner with the approval of the Secretary.

(d) In the absence of any notice to the Commissioner under subdivision (a) or (b), notice under this title of a deficiency or other liability, if mailed to the taxpayer or other person subject to liability at his last known address, shall be sufficient for the purposes of this title even if such taxpayer or other person is deceased, or is under a legal disability, or, in the case of a corporation, has terminated its existence.

The petitioner contends that the aforementioned provisions of the Act are inapplicable because "the deficiency notice was not *addressed* to the 'taxpayer or other person subject to liability at his last known address', etc."

It will be observed that section 281 above merely requires that the notice of deficiency be "*mailed* to the taxpayer or other person" etc., and it provides that such a notice so *mailed* "shall be sufficient \* \* \* even if such taxpayer or other person is deceased." In other words, a notice addressed to a taxpayer or a legal representative thereof and duly mailed to the "last known address" would suffice even though the said taxpayer or legal representative should then be deceased and some other person or persons substituted therefor.

As far as we are informed the notice here was apparently mailed to the last known address of the taxpayer, at least there is no evidence to the contrary. If the notice had been addressed to Dodson himself without prefixing the word "Estate" and properly mailed, there can be no doubt that such a notice would have satisfied the statutory requirements and we perceive no reason why the use of that word should alter the situation, particularly in view of the fact that the representatives of the estate assume the powers, rights, duties and privileges of the taxpayer and have invoked the jurisdiction of this Board to hear and consider the merits in contesting this deficiency.

In allegation of error numbered five herein the petitioner avers that the respondent erred in deducting the sum of $11,931.77 from the income reported by Dodson for 1922, because said sum was actually received in that year. The respondent's answer admits that

such a deduction was made, but denies that error was committed. If the amount in question represents a release to Dodson of part of the prior years' reserve to make up the difference in commission of the amount actually received in such prior year and the 30 per cent, it is income to him in the year collected in view of the holding on the first issue hereinabove discussed.

The sixth allegation of error is with respect to the failure of the respondent to allow $12,239.98 as a deduction for 1923 on account of a loss sustained in the purchase of German marks. The petitioner purchased 1,134,782 German marks at a total cost of $12,239.98, all of which he owned and had not disposed of in 1923. He claimed a deduction of that amount in the computation of his net income for 1923 because of the substantial worthlessness thereof which the respondent disallowed. The facts here are practically identical with those in *Louis Stern*, 5 B. T. A. 870, and *Carl Stern*, 5 B. T. A. 871, and, therefore, our decision here as there must be for the petitioner.

The seventh allegation of error herein is that section 280 of the Revenue Act of 1926 under which the respondent is acting is in conflict with the Constitution and, therefore, void. It is only necessary to say on this issue that the respondent is not acting under section 280, and if he were, the petitioner may not invoke it and at the same time question its validity. *Henry Cappellini et al.*, 14 B. T. A. 1269.

The eighth, an affirmative allegation of error urged by the respondent, is with respect to the sums of $28,590.06 and $33,045.94 received by Dodson from the Exchange in the years 1920 and 1921, which the respondent contends are income and, therefore, taxable in those years. The record discloses that the Exchange paid Dodson those two amounts on May 20, 1920, and April 22, 1921, respectively, which were charged to Dodson's excess reserve No. 2 account, and that they represented withdrawals by Dodson for advances made by him to the Exchange during the years 1912, 1913, 1914, and 1915. It was not until 1920 and 1921 that the excess reserve No. 1 account contained a sufficient balance to permit the reimbursement of those advances to Dodson. Those amounts did not constitute income to Dodson, but reimbursement of capital and are, therefore, not taxable as alleged by the respondent.

The ninth, another affirmative allegation urged by the respondent, is that in 1920 Dodson paid to himself out of the funds of the Exchange the sum of $25,000 which he failed to include in his taxable income for that year. It appears from the record that the Exchange did in fact pay Dodson $25,000 for expenses and that said sum was charged to excess reserve No. 2 account on January 20, 1920; that through error the said amount was not returned as income for tax

purposes in 1920 but, however, it being a part of the excess reserve No. 2 account, the amount has already been included in the respondent's deficiency. Therefore, it appearing clearly that error was committed by Dodson and that it has been rectified by the inclusion of the amount in the deficiency notice herein, the respondent's action in so doing is sustained.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

PHILLIPS and VAN FOSSAN concur in the result only.

---

ARUNDELL, dissenting: As I understand the facts, Dodson held a separate power of attorney from each subscriber to the so-called reciprocal exchange, authorizing him under certain specified conditions to exchange indemnity with other subscribers. In consideration of Dodson defraying certain expenses incident to conducting the business including compensation for his services, he was authorized by the powers of attorney to deduct 30 per cent of all monies received by him from the subscribers. This provision for compensation was never abrogated, but appeared in all the powers of attorney issued during the successive years before us for consideration. The fact that Dodson saw fit to leave a portion of his compensation in the business, which business was essentially his own, can not alter the fact that the 30 per cent received by him was his own at all times and constituted an item of gross income to be returned for taxation. When one receives income, his election to dispose of it one way or another or leave it in his business does not make it other than taxable income.

LANSDON, STERNHAGEN, and BLACK agree with this dissent.