Herbert H. HASTINGS et ux., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Edward L. MARTIN et ux., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 41263, 41264.

United States District Court
N. D. California.

Sept. 26, 1967.

Julian N. Stern, Jerry H. Robinson, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for plaintiffs.

Cecil F. Poole, U. S. Atty., Lawrence E. Doxsee, Asst. U. S. Atty., San Francisco, Calif., for defendants.

## MEMORANDUM DECISION AND ORDER

GEORGE B. HARRIS, Chief Judge.

These consolidated actions were initiated by plaintiff taxpayers to recover alleged overpayment of income taxes for the calendar years 1955 and 1958 in the amounts of $7,039.47 and $15,616.54, respectively, in Civil Action 41263, and $5,073.78 and $21,385.25, respectively, in Civil Action 41264, plus interest. The controversy arose when the government redetermined the allowable depreciation deductions on three office buildings held for the production of rental income by the Associated Investment Company, a partnership in which plaintiff Martin has a 51% interest and plaintiff Hastings, a 49% interest.

According to the provisions of § 167(a) of the Internal Revenue Code of 1954, "There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in the trade or business, or (2) of property held for the production of income." Since the purpose behind a depreciation allowance is to permit the taxpayer to recover his cost or basis of the property over the useful life of the investment, it is apparent that any computations must take into account (1) the cost of the property, (2) its useful life and (3) the salvage value, if any.

Considerations one and three are uncontested. The inquiry narrows itself therefore to the singular issue: What were the useful lives of the various assets comprising the Tioga, Bermuda, and El Dorado Buildings, the property in question, for the purpose of computing Associated's depreciation for the fiscal year ended June 30, 1958.

### THE LAW

Treasury Regulations § 1.167(a)–1(b) provide that " * * * the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements."

Further, "Obsolescence may render an asset economically useless to the tax-

payer regardless of its physical condition. Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes." Treas.Reg. § 1.167 (a)–9.

These same Regulations indicate that the taxpayer must bear the responsibility for establishing the reasonableness of the depreciation deduction claimed. Reg. § 1.167(b)–(O)(a). The Commissioner's determination is presumptively correct. Nevertheless, the taxpayer may demonstrate by definite factual proof that the position of the Commissioner is arbitrary, unreasonable or improper.

### THE FACTS

Applying these guidelines to the evidence adduced at trial, it is abundantly clear and certain that the decision of the Commissioner cannot be sustained. Each taxpayer testified as to his extensive experience in dealing with other commercial property similar to the buildings involved in the present proceeding. They stated categorically that the assets were acquired with the purpose of capitalizing on a particular need of the time of specific tenants, i. e., cheap, bulk office space. The minimum cost of construction and remodeling plus the poor and inflexible design of the buildings demonstrates this proposition and indicates a situation type investment. Further, cheapest obtainable materials were used, and creature comforts almost totally omitted. The taxpayers have followed a consistent plan of not keeping the buildings in a state of good repair with the view of replacing the facilities well within the physical life of the plant.

In addition, depreciation deductions were computed only after a careful survey was made by the taxpayers' expert who also testified at trial that such structures could not compete and were not intended to compete with the modern office buildings which have since appeared in the same area and those which are in the process of construction. The technological advances in the engineering and building materials trade have established a higher standard in accord with the needs and demands of commercial tenants. Moreover, the taxpayers started with property into which more than average obsolescence was built.

The expert for the Government, Mr. Niethammer, on the other hand, indicated that he estimated a longer useful life for the property because of their prime location, increased land values and commercial development in the East Bay. His survey was performed well after the tax years in question, unlike the 1959 appraisal submitted by Mr. Shiach so Mr. Niethammer was able to to benefit from hindsight. Nevertheless, the court is of the opinion that his testimony and report were geared to an incorrect theory and standard and based for the most part on irrelevancies and hypotheticals.

He failed to consider that "useful life is measured by use in a taxpayer's business, not by the full abstract economic life of the asset in any business." Massey Motors, Inc. v. United States, 364 U.S. 92, 97, 80 S.Ct. 1411, 1415, 4 L.Ed.2d 1592 (1964). That the building may have a structural life far in excess of its useful life is likely and that there will always be some tenants who would make use of relatively inexpensive, bulk office space is also probable, but these are not the relevant criteria. Rather, we must look to the taxpayers' particular and reasonable use of the property and that is to achieve maximum revenue production in keeping with the ratio of floor space to lot value which both experts agreed had substantially increased and will continue to increase because of renewal and redevelopment.

The prime commercial location of the buildings supports and gives credence to the plaintiff's plan to replace the present structures within the depreciation schedule limits rejected by the government. Moreover, the report of Mr. Shiach and his testimony, as well as that of the taxpayers, present the evidentiary

predicate upon which this court may fairly determine the useful lives of the shells and components of the Bermuda, El Dorado and Tioga buildings

Accordingly, and based on a consideration of all the evidence, including stipulations, exhibits and testimony and the arguments and memoranda of counsel, the court finds as follows:

## FINDINGS OF FACT

1. These are consolidated civil actions to recover income taxes and interest thereon erroneously collected from the plaintiffs. The actions are brought pursuant to the authority conferred by Section 1346(a) (1) of Title 28, United States Code, as amended.

2. The plaintiffs are all citizens of the United States, residing in the Northern District of California.

3. The plaintiffs, Edward L. and Jeanne Martin, are husband and wife. The Martins timely filed with the District Director of Internal Revenue, San Francisco District, a joint income tax return for the calendar year 1955, showing no tax due. During the year 1955, the Martins paid $587 as estimated tax, which amount was applied by the Commissioner of Internal Revenue to taxes other than tax for the year 1955. On March 18, 1960, the Commissioner of Internal Revenue assessed additional 1955 income tax against the Martins in the amount of $9,170.56 and assessed interest thereon in the amount of $2,159.-60. This assessed tax and interest, together with interest thereon, was paid by the Martins to the United States on July 13, 1960, in the aggregate amount of $11,508.34. (Pre-Trial Order)

4. The Martins timely filed with the District Director of Internal Revenue, San Francisco District, a joint income tax return for the calendar year 1958, showing a tax of $1,217.53. During the calendar year 1958, $4,212 was withheld as tax on the wages of Edward L. Martin. On June 29, 1962, the Commissioner of Internal Revenue assessed additional 1958 income tax against the Martins in the amount of $20,167.72 and assessed interest thereon in the amount of $3,302.41. The $4,212 withheld from wages was credited against the 1958 tax shown on the return and against the additional assessment; the balance of the assessed tax and interest, an aggregate amount of $20,475.66, was paid by the Martins to the United States on July 10, 1962 (Pre-Trial Order)

5. The Martins timely filed a claim for refund of the overpayment of 1955 income tax, based solely on a net operating loss carryback from the calendar year 1958. The amount of the claim for refund was $5,073.78, together with interest paid thereon. (Pre-Trial Order)

6. The Martins timely filed a claim for refund of the overpayment of income tax for the calendar year 1958 in the amount of $20,167.72, together with interest paid thereon, which claim for refund alleged that there properly should have been no tax liability for the year 1958. (Pre-Trial Order)

7. The plaintiffs, Herbert H. and Euretta Hastings, are husband and wife. The Hastings timely filed with the District Director of Internal Revenue for the San Francisco District, a joint income tax return for the calendar year 1955 showing no tax due. During 1955, the Hastings paid $364.46 as estimated tax, which amount was subsequently applied by the Commissioner of Internal Revenue to taxes other than tax for the year 1955. On March 18, 1960, the Commissioner of Internal Revenue assessed additional 1955 income tax against the Hastings in the amount of $8,329.37 and assessed interest thereon in the amount of $1,961.51. This assessed tax and interest, together with interest thereon, was paid by the Hastings to the United States on July 13, 1960, in the aggregate amount of $10,452.72. (Pre-Trial Order)

8. The Hastings timely filed with the District Director of Internal Revenue, San Francisco District, a joint income tax return for the calendar year 1958, showing no tax due. During the

calendar year 1958, $3,780 was withheld as tax from the wages of Herbert H. Hastings. On June 29, 1962, the Commissioner of Internal Revenue assessed additional 1958 income tax against the Hastings in the amount of $15,616.54, and assessed interest thereon in the amount of $2,276.16. The $3,780 which was withheld from wages was credited against the assessed 1958 tax; the balance of the assessed tax and interest, an aggregate amount of $14,112.70, was paid by the Hastings to the United States on July 10, 1962. (Pre-Trial Order)

9. The Hastings timely filed a claim for refund of an overpayment of income tax in the amount of $7,039.47, together with interest thereon, for the year 1955 based solely on a net operating loss carryback from calendar year 1958. (Pre-Trial Order)

10. The Hastings timely filed a claim for refund of an overpayment of income tax for the year 1958 in the amount of $15,616.54, together with interest paid thereon. (Pre-Trial Order)

11. All of the claims for refund referred to above have been disallowed by the Commissioner of Internal Revenue, and no part of the claimed overpayments of income taxes has been refunded to the plaintiffs. (Pre-Trial Order)

12. Associated Investment Company (hereinafter called "Associated") is a partnership, in which the plaintiff, Edward L. Martin, has a 51% interest and in which the plaintiff, Herbert H. Hastings, has a 49% interest. The taxable year of the partnership is a fiscal year ending June 30. (Pre-Trial Order)

13. Associated, during its entire fiscal year ended June 30, 1958, owned the Tioga Building, the Bermuda Building and a 75% interest in the El Dorado Building. During that fiscal year these buildings were held by the partnership for the production of rental income and, therefore, were assets depreciable under Section 167 of the Internal Revenue Code of 1954. (Pre-Trial Order)

14. The Tioga Building is a five-story office building located at 2020 Milvia Street, Berkeley, California. It was constructed new by Associated and placed in service on May 1, 1955. (Pre-Trial Order; Exhibit 9, p. 9)

15. The Tioga Building is a flat-roofed, concrete slab structure supported by exposed, painted, steel tubular columns braced by painted, reinforced, concrete walls. (Tr. 25, 27; Exhibit 9, pp. 9–10) The building was erected hastily, utilizing the lift slab technique on the concrete floors. (Exhibit 9, p. 11; Tr. 166, 170–71) The finished flooring and ceiling are placed directly on the structural floor slabs, slabs which cured out with obvious waviness. (Exhibit 9, p. 11; Tr. 25–26, 33–34, 166). Since there is no system of under-floor ducts, the building lacks electrical flexibility; any further changes in the electrical system to meet the needs of tenants will have to be met with an exposed system. (Tr. 26–29, 36) Similarly, the absence of a suspended ceiling requires exposed ducts for any future mechanical and heating revisions. (Tr. 26–27) The roof is of tar and gravel. (Exhibit 9, p. 9; Tr. 24–25) The building is heated by a supply system of warm air, using exposed ducts painted with rough textured paint. (Tr. 30) A central blower on each floor transfers the air and causes it to be returned by sucking it down corridors and under doors. (Tr. 30) The elevators are slow, hydraulic type with erratic performance and are inadequate for the building. (Exhibit 9, p. 12; Tr. 31–32, 165) Domestic type plumbing fixtures have been used. (Exhibit 9, p. 11; Tr. 23, 32–33) Only certain portions of the ceiling are covered by acoustical tile, and there is no soundproofing in the partitions. (Tr. 27–28, 32, 166–67) The electrical system is minimum, utilizing the least expensive fluorescent fixtures. (Tr. 22–23, 29–30) The main electrical service will not accommodate any substantial increase in lighting or

power loads. (Tr. 42) Interior partitions were job-built, installed to suit the needs of the original tenants, and did not lend themselves to relocation for other tenants. (Tr. 33–34) A substantial portion of the floor space is as much as forty-five feet from the exterior walls. (Tr. 34–35) The building was not designed by an architect. (Tr. 42–45)

16. The genesis of the Tioga Building was the obtaining, by competitive bidding, of a five-year lease with the United States as tenant of a substantial square footage of bulk space. (Tr. 18–19) The Tioga Building was designed and built solely to meet the needs of this single tenant, which was to secure the minimum livable space at the lowest possible cost. (Tr. 19, 46) In bidding for this lease, Associated was competing with twenty-five to thirty-five year old buildings, the only buildings which could have provided the United States with space to meet its requirements for minimal facilities. (Tr. 20–21) Associated was able to compete with these old buildings and obtain the lease only by utilizing substandard construction. (Tr. 21, 36–37) The construction costs were only $8.50 per square foot. (Tr. 21; Exhibit O, p. 9) As a result, the building's bulk space is inflexible to meet the needs of other, smaller tenants. (Tr. 35, 40–41, 44–45, 110, 165) In the terms of design and type of construction and fixtures, the building had builtin functional obsolescence. (Tr. 23–24, 165) There were no modern conveniences such as air conditioning, area controlled heating, soundproofing and parking space. (Tr. 22, 37, 40–41, 165) The plaintiffs never intended the building or its components to be functionally or economically useful for their physical lives. (Tr. 23, 137–38) The longest lease with any tenant was for a five-year term. (Tr. 39)

17. The El Dorado Building is an office building, located at 360 Twenty-Second Street, Oakland, California. This building consists of a remodeled, three-story garage, erected in approximately 1920, on top of which Associated added new construction to make an eight-story building. The improvements and new construction were completed and the building was placed in service by Associated on October 1, 1956. (Pre-Trial Order; Exhibit 5; Exhibit 9, p. 2; Tr. 49–51)

18. Construction of the El Dorado Building is of minimal quality. (Exhibit 9, p. 4; Tr. 54, 170–71) The heating and ventilation systems are poor, characterized by large area zone thermostats and inflexibility for meeting the needs of new tenants. (Exhibit 9, pp. 4–5; Tr. 167) Elevator service is minimal designed to meet the requirements of only a five-story building. (Tr. 55–56) There is no elevator service on the eighth floor. (Tr. 56) The plumbing system is minimum. (Tr. 167) There is no air conditioning (Tr. 167) The electrical system has been designed for the original tenants, and is inflexible. (Tr. 168–69) The ceilings have been coated with a minimum of acoustical plaster; the job-built partitions afford no soundproofing. (Exhibit 9, p. 4; Tr. 167) The building reconstruction was not designed by an architect. (Tr. 56)

19. The El Dorado Building was acquired and remodeled to meet the bulk space needs of a single tenant, the Pacific Telephone and Telegraph Company. (Tr. 51–53, 57–58) Associated would not have acquired and remodeled the El Dorado Building without first having in hand the telephone company lease. (Tr. 58) In order to obtain this lease, it was necessary for Associated to compete with space offered by thirty-year old buildings in the area. (Tr. 54–55) The telephone company's standards for this space were minimal and Associated was able to utilize, in remodeling and adding to the El Dorado Building, the least expensive construction and fixtures. (Tr. 53–54) The construction costs were $10.86 per square foot. (Tr. 54; Exhibit O, p. 6) The plaintiffs were capitalizing on a particular economic opportunity with no expectation of using the building or its components for any periods related

to physical lives. (Tr. 51–55, 137–38, 176) The telephone company lease was for a ten-year term. (Tr. 53) The El Dorado Building was functionally obsolete in 1959. (Tr. 167)

20. The Bermuda Building is located at 2150 Franklin Street, Oakland, California. This was a four-story warehouse, erected in the 1920's, and which was acquired by Associated in 1955. Associated added three stories to the top of the warehouse building and the entire building, including the new construction, was placed in service on March 1, 1956. (Pre-Trial Order; Exhibits 6 and 7; Tr. 29)

21. The Bermuda Building reflects a minimal overall quality of construction. (Exhibit 9, p. 8; Tr. 64–65, 170–71) The construction costs were $11.96 per square foot. (Tr. 64; Exhibit O, p. 8) The fourth floor has an obvious pitch of about two or three feet. (Exhibit 9, p. 8; Tr. 65) The building was not architecturally designed, and its reconstruction was limited by the fact that the building is a remodeled warehouse. (Tr. 67–68) Minimum heating and ventilation systems were installed. (Tr. 66) One of the two elevators in the building was a manually controlled machine, which was salvaged from another building and was slow and unattractive. (Exhibit 9, p. 8; Tr. 68). Plumbing is average and the electrical system is inadequate with no flexibility. (Tr. 66, 168–69). There is no soundproofing in the building, although acoustical plaster ceilings have been used for appearance. (Tr. 66)

22. The Bermuda Building was acquired by Associated, remodeled and expanded to provide rentable bulk space, competing with bulk-space buildings erected thirty to thirty-five years earlier. (Tr. 64) It was designed to meet a particular economic need which existed at the time, and it was recognized by the plaintiffs that the building and its components would become obsolete long before the end of their physical lives. (Tr. 63–65, 137–38, 176) The building was functionally and economically obsolete in 1959. (Tr. 70–72, 168)

23. In recent years, functional obsolescence of office buildings has progressed at a much more rapid pace than it did prior to World War II. Among the reasons for this has been the development of a greater demand on the part of tenants for "creature comforts" such as air conditioning, zone controlled heating, adequate parking, flexible design and modern elevator service. Also, economic useful lives of office buildings have become shorter with the constantly improving techniques of razing buildings and with the pressures of competition and taxes. (Exhibit 9, pp. 14–15; Tr. 37, 149–50, 171, 176–78)

24. Most new, good office buildings have a number of features such as air conditioning, individually-controlled small zone thermostats for heating, suspended ceilings, floors and electricity sufficient for IBM office equipment, movable partitions, space for record storage, architectural design, flexibility for meeting the needs of new tenants, soundproofing, modern lighting, adequate parking facilities and adequate elevator service. All of these features were absent from the Tioga, Bermuda and El Dorado Buildings. (Exhibit 9, pp. 14–15; Tr. 450–54) While the construction costs of the Tioga, El Dorado and Bermuda Buildings ranged from $8.50 per square foot to $11.96 per square foot, the construction costs of new, good office buildings ranged from $25.00 to $35.00 per square foot. (Tr. 22, 454–55)

25. Associated is not attempting to keep the three buildings in a state of repair which will continue to attract the quality of tenants that were the first occupants. (Tr. 96–97)

26. Based on the plaintiffs' experience with similar property taking into account present conditions and probable future developments, on wear and tear and decay or decline from natural causes, on the normal progress of the art, economic changes, inventions and current developments within the industry and the plaintiffs' trade or business and on the plaintiffs' policy as to repairs, renewals, and replacements, the periods remaining at

July 1, 1957, over which the components of the three buildings could reasonably be expected to be useful to the plaintiffs are as follows:

### TIOGA BUILDING

| | | REMAINING LIFE AT 7/1/57 |
|---|---|---|
| Shell: | Basic | 32 years |
| | Glass and sash | 16 years |
| Roofing | | 8 years |
| Fire escapes and stairway | | 22 years |
| Fire equipment | | 22 years |
| Heating: | Heaters and blowers | 12 years |
| | Ducts | 12 years |
| | Pipelines | 12 years |
| Electrical: | Fixtures | 17 years |
| | Wiring | 17 years |
| | Conduit | 17 years |
| | Panel | 17 years |
| Plumbing: | Fixtures | 22 years |
| | Pipes | 22 years |
| Painting | | 3 years |
| Floor covering | | 7 years |
| Doors, cabinets, entrances | | 10 years |
| Elevator: | Contract | 10 years |
| | Tower and pit | 10 years |
| Acoustical tile | | 12 years |

(Ex. 9; Tr. 13–17, 85–88, 96, 126–130, 133–136, 177–181, 277)

### EL DORADO BUILDING

| | | |
|---|---|---|
| Shell: | Basic | 37 years |
| | Glass and sash | 19 years |
| Roofing | | 8 years |
| Stairs | | 37 years |
| Heating: | Heaters and blowers | 12 years |
| | Ducts and vents | 12 years |
| | Controls | 12 years |
| Electrical: | Fixtures | 19 years |
| | Wiring | 19 years |
| | Conduit | 19 years |
| | Panel | 19 years |
| | Permit | 19 years |
| Plumbing: | Fixtures | 22 years |
| | Pipes | 22 years |
| | Gas | 22 years |
| | Fire Protection | 22 years |
| Interior walls and partitions | | 12 years |
| Painting | | 4 years |
| Floor covering | | 7 years |
| Plaster ceilings | | 17 years |
| Doors, cabinets, entrance | | 12 years |
| Elevators: | Contract | 18 years |
| Acoustical tile | | 9 years |
| Original building | | 37 years |

(Ex. 9; Tr. 13–17, 91–93, 96, 126–130, 136–137, 177–181, 277)

| BERMUDA BUILDING | | REMAINING LIFE AT 7/1/57 |
| --- | --- | --- |
| Shell: | Basic | 32 years |
| | Glass and sash | 16 years |
| Roofing | | 8 years |
| Stairs | | 32 years |
| Roof Fencing | | 25 years |
| Heating: | Heaters and blowers | 12 years |
| | Ducts | 12 years |
| | Pipelines | 12 years |
| | Controls | 12 years |
| | Sundry | 12 years |
| Electrical: | Fixtures | 18 years |
| | Wiring | 18 years |
| | Conduit | 18 years |
| | Panels | 18 years |
| | Sundry | 18 years |
| Plumbing: | Fixtures | 22 years |
| | Pipes | 22 years |
| Interior walls and partitions | | 14 years |
| Painting | | 4 years |
| Floor covering | | 7 years |
| Ceilings | | 15 years |
| Doors, cabinets, etc. | | 14 years |
| Elevators: | Contract (new) | 18 years |
| | Tower | 6 years |
| | Passenger (reconditioned) | 6 years |
| Original building | | 32 years |

(Ex. 9; Tr. 13–17, 88–91, 96, 126–130, 136–137, 177–181, 277)

———◆———

27. The periods remaining at July 1, 1957, over which the "special tenant improvements" reasonably would be expected to be useful to the plaintiffs are not in excess of the then unexpired terms of the lease to which the improvements relate. (Tr. 46–48, 76–85)

CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter of this action. 28 U.S.C. §§ 1340, 1346(a) (1).

2. The plaintiffs in Civil Number 41263, Herbert H. and Euretta Hastings, are entitled to refunds of income taxes for the calendar years 1955 and 1958 in the amounts of $7,039.47 and $15,616.54, respectively, plus assessed and statutory interest.

3. The plaintiffs in Civil Number 41264, Edward L. and Jeanne Martin, are entitled to refunds of income taxes for the calendar years 1955 and 1958 in the amounts of $5,073.78 and $21,385.25, respectively, plus assessed and statutory interest.

An appropriate judgment may be prepared by the plaintiffs consistent with the foregoing.