DAVID G. and DELORES H. SATTERFIELD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Satterfield v. Commissioner
Docket No. 3418-73.
United States Tax Court
T.C. Memo 1975-203; 1975 Tax Ct. Memo LEXIS 170; 34 T.C.M. (CCH) 872; T.C.M. (RIA) 750203; June 25, 1975, Filed Paul E. Castelloe and Lacy H. Reaves, for the petitioners. Eric B. Jorgensen, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined a deficiency of $1,395.43 in the income tax of petitioners for the taxable year 1970. The sole issue for our determination is whether $5,985.88 of the amount petitioners reported as rental income is to be treated as a reimbursement for expenditures incurred by them on behalf of their lessee for improvements to the leasehold property and thus excludable *171 from gross income. FINDINGS OF FACT Some of the facts have been stipulated and these stipulations are adopted as a part of our findings. The pertinent facts are summarized below. Petitioners, [1] David G. and Delores H. Satterfield, are husband and wife and resided in Clayton, N.C., during the year in issue and at the time of the filing of their petition with this Court. For the taxable year 1970 their joint Federal income tax return was timely filed with the Southeast Service Center, Chamblee, Ga. Petitioners employ the cash receipts and disbursements method of accounting. During the taxable year 1970 David G. Satterfield was engaged as a dealer of petroleum products. In addition to the petroleum dealership, petitioners owned and leased to commercial tenants certain warehouses located in Clayton, N.C. The above-mentioned warehouse property was purchased by petitioners in February 1968 from Central Oil and Milling Company of Clayton, N.C. At the date of purchase the property was subject to two leases which were assigned to petitioners. The lessee in both leases was Norwich Mills, *172 Inc. (Norwich), of Norwich, N.Y. One lease, dated September 1, 1965, covered warehouse number eight; the other, dated December 28, 1967, covered warehouse number one. There was also a third lease between petitioners and Norwich covering additional warehouse space. On March 14, 1969, Champion Products, Inc. (Champion) acquired Norwich through a merger and Norwich became a wholly-owned subsidiary. Norwich later was liquidated and became an operating division of Champion. In the early fall of 1969 Wayne K. Bright (Bright), Vice President of Finance of Champion, visited and inspected the warehouse facilities. He subsequently instructed William C. Dillon, Sr. (Dillon), Comptroller of Norwich, to negotiate a consolidation of the leases. In addition Dillon was directed to cause petitioners to reduce the fire hazard in warehouse number one resulting from its wooden flooring and to construct a cyclone fence around the loading ramps for additional safety. Aside from the fire hazard, Bright was also of the opinion that the flooring was in need of general repair. Dillon then conferred with petitioner and George Kloster, the plant manager of a manufacturing plant owned by Norwich in Clayton. *173 As a result of this conference, petitioner agreed to consolidate the leases into one lease to commence on January 1, 1970. Petitioner also agreed to install a concrete floor in warehouse number one and to construct a cyclone fence around the loading ramps. The new lease and supplemental agreement, set forth in the margin, [2] were drawn up by petitioners' attorneys. *174 On November 24, 1969, petitioner borrowed $6,000 from the Southern National Bank of North Carolina to pay for the improvements. The promissory note required petitioners to make 12 monthly payments of $533.10 beginning January 8, 1970, for a total of $6,397.20. In December 1969 petitioners installed the concrete floor in warehouse number one at a cost of $5,183 and constructed the cyclone fence at a cost of $802.88 for a total cost of $5,985.88. Norwich agreed to reimburse petitioners for the cost of the improvements through increased rental payments. To accommodate the repayment of petitioners' loan, Norwich further agreed to pay a higher rent during the first year of the lease rather than spreading the increase over the three-year term of the lease. For the first year the rental payments were to be $1,935 per month; for the last two years they were to be $1,400 per month. (See lease, footnote 2, supra.) During 1970 Norwich paid petitioners $23,220, all of which petitioners reported as rental income. [3] Petitioners, on their 1970 return, took depreciation deductions for the concrete floor and cyclone fence. *175 ULTIMATE FINDING OF FACT The $5,985.88 reimbursement for the improvements made by petitioners is additional rental income includable in petitioners' gross income for 1970. OPINION Section 61(a)(5)[4] provides that gross income includes any rental payments received or accrued during the taxable year. In our judgment the additional rental payments herein must be included in petitioners' gross income. Section 1.61-8, Income Tax Regs.[5] See and compare FrankT. B. Martin,11 B.T.A. 850 (1928), with Beecham, Inc. v. United States, an unreported case ( E.D. Tenn. 1973, 32 AFTR 2d 73-5916, 73-2U.S.T.C. par. 9719). *176 Petitioners submit that the $5,985.88 expended for improvements should be excludable from their gross income by reason of section 109[6] and M. E. Blatt Co. v. United States,305 U.S. 267 (1938). This argument hinges upon their contention that the improvements were in fact lessee improvements. We cannot agree. It is our opinion that the facts clearly reflect that the improvements were those of petitioners (the lessor) and not those of their lessee. The fact that the lessee agreed to reimburse petitioners for the cost of the improvements through higher rental payments does not render the improvements lessee improvements. Furthermore, petitioners' reliance on clause 3(c) of the lease (see footnote 2, supra) is misplaced. That provision of the lease refers only to alterations *177 and does not provide that the lessee is to make all improvements. It is our opinion that the installation of the cement floor and the construction of the cyclone fence were permanent improvements not encompassed by the term "alterations" as that term is used in the lease. We believe that the term "alterations" as used therein refers only to changes made to accommodate the particular needs of the lessee and does not include changes that are improvements of a permanent and general nature. Our view is buttressed by the fact that the lease further requires that any alterations shall be made at the expense of the lessee and shall also be restored at his expense at the termination of the lease except upon the written consent of the owner. We do not believe the cement floor and cyclone fence were intended to be "restored" in the sense used in the lease. Even assuming arguendo that the improvements were covered by clause 3(c), it still does not follow that improvements made at the expense of the lessee are the same as improvements made by the lessee. In short, petitioners have failed to overcome their burden of proving that in substance the improvements were lessee improvements, not lessor *178 improvements. Because of the above finding, section 109, by its very terms, is not in point. See also section 1.109-1(a), Income Tax Regs.[7]
Similarly, M. E. Blatt Co. v. United States,supra, is not in point as that case also involves lessee improvements, not lessor improvements. The other cases relied upon by petitioner [8] are also clearly distinguishable from the instant situation. *179 As it is our finding that the improvements were lessor improvements, not lessee improvements, even though the lessor was reimbursed, respondent must be sustained on the issue. To reflect other adjustments, Decision will be entered under Rule 155.
Footnotes
1. When the term "petitioner" is used in the singular, it refers to David G. Satterfield.↩
2. LEASE
THIS LEASE, made and entered into this the 14th day of October, 1969, by and between D. G. SATTERFIELD and wife DOLORES H. SATTERFIELD, parties of the first part (hereinafter called OWNER); and NORWICH MILLS, INC., a New York corporation with its principal place of business in Norwich, New York, part of the second part, (hereinafter called LESSEE): WITNESSETH: That the Owner has hereby leased to the Lessee, and the Lessee has hereby hired and taken from the Owner the following described property: Warehouse #1 and Warehouse #8 and Rooms 2, 3, 4, 6, and 7, all under the same roof, located at 306 Main Street, in Clayton, North Carolina, formerly known as Central Oil and Milling Company property. The terms and conditions of this Lease are agreed to be as follows: 1. The term of this lease shall be three (3) years, beginning January 1, 1970 and terminating December 31, 1972; provided, however, that on or before November 1, 1972 Lessee shall have the option for renewal for another two-year term provided such option is exercised by written notification to the Owner on or before said date of November 1, 1972, upon the same terms and conditions as provided for in the original term of this lease EXCEPT as to monthly rental, which shall be $1400.00 per month for the years 1973 and 1974. 2. As rental for said premises, said party of the second part shall pay to the parties of the first part for the first twelve (12) months of this lease, the sum of $1,935.00 per month, payable in advance on or before the first day of each month, beginning with the month of January 1970; and for the remaining period of said lease, the sum of $1,400.00 per month, beginning January 1, 1971, payable monthly in advance on or before the first day of each month, beginning with the month of January 1971. 3. It is also mutually agreed as follows: (a) The Owner shall be responsible for and shall pay all taxes and assessments imposed on the demised premises by any lawful authority. (b) The Owner shall carry insurance on the building but not on the contents thereof, and shall maintain the sprinkler system and the roof, walls and structural parts of the building in proper condition for use by Lessee. (c) Electrical service will be separately metered at the expense of and for the account of the Lessee. Any alterations to the building shall be at the expense of the Lessee and shall be restored by the Lessee at its own expense at the termination of the Lease except upon written consent of the Owner. 4. The Lessee covenants and agrees that it will take good care of the premises and upon the termination of this Lease, will surrender the premises in as good order and condition as they are in the beginning of this Lease, ordinary wear and tear excepted; and that it will make no unlawful or offensive use of the premises. If the Lessee shall fail and neglect to make any payment of rent when due or within fifteen (15) days after written notice thereof, or shall violate any of the provisions of this Lease, the Owner, without any other notice or demand, may at their option, terminate this lease and require the Lessee to vacate the premises hereby demised, or may enter the premises and expel the Lessee therefrom, or the Owner may in lieu of the above or in conjunction therewith, pursue any other lawful right or remedy incident to the relationship created by this Lease. AGREEMENT
THIS CONTRACT AND AGREEMENT, Made and entered into this 14th day of October, 1969, by and between D. G. SATTERFIELD and wife DOLORES H. SATTERFIELD, Parties of the first part; and NORWICH MILLS, INC., a New York corporation, with its principal place of business in Norwich, New York, party of the second part; WITNESSETH: WHEREAS, said parties of the first part have entered into a lease with the party of the second part for certain warehouse property in the Town of Clayton, North Carolina, said lease to begin on the first day of January, 1970, and have agreed to make certain repairs and additions to said property prior to the effective date of said lease. NOW, THEREFORE, it is agreed between the parties hereto that the parties of the first part will: (1) Remove the wooden floors that are now in existence in Warehouse #1 and will replace said floors with a concrete floor; (2) That they will install 215 feet of 4-foot cyclone fence and 68 feet of 6-foot cyclone fence around the loading ramps parallel to the Southern Railroad Spur Track, with three gates, the location of which is to be specified by the party of the second part.↩
3. We note in passing that petitioners' return reflects a total gross rental income from the warehouse of $23,320.↩
4. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: * * * * *
(5) Rents; ↩
5. Rents and royalties. (a) In general. Gross income includes rentals received or accrued for the occupancy of real estate or the use of personal property. * * * (b) Advance rentals; cancellation payments. Gross income includes advance rentals, which must be included in income for the year of receipt regardless of the period covered or the method of accounting employed by the taxpayer. * * * (c) Expenditures by lessee. As a general rule, if a lessee pays any of the expenses of his lessor such payments are additional rental income of the lessor. If a lessee places improvements on real estate which constitute, in whole or in part, a substitute for rent, such improvements constitute rental income to the lessor. Whether or not improvements made by a lessee result in rental income to the lessor in a particular case depends upon the intention of the parties, which may be indicated either by the terms of the lease or by the surrounding circumstances. For the exclusion from gross income of income (other than rent) derived by a lessor of real property on the termination of a lease, representing the value of such property attributable to buildings erected or other improvements made by a lessee, see section 109↩ and the regulations thereunder. * * *
6. SEC. 109. IMPROVEMENTS BY LESSEE ON LESSOR'S PROPERTY. Gross income does not include income (other than rent) derived by a lessor of real property on the termination of a lease, representing the value of such property attributable to buildings erected or other improvements made by the lessee.↩
7. In section 1.109-1(a), Income Tax Regs., note particularly the following: The exclusion applies only with respect to the income realized by the lessor upon the termination of the lease and has no application to income, if any, in the form of rent, which may be derived by a lessor during the period of the lease and attributable to buildings erected or other improvements made by the lessee. * * *↩
8. See Charles M. Howell, Administrator,21 B.T.A. 757 (1930); Hilldun Corp.,T.C. Memo. 1967-210; and Estate of William F. Markham,↩ a Memorandum Opinion of this Court dated June 9, 1943.