LOUIS C. FIELAND AND RUTH F. FIELAND, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2001–75.    Filed January 30, 1980.

Louis C. Fieland, pro se.
*Jani Maurer* and *Larry Kars,* for the respondent.

RAUM, *Judge:* The Commissioner determined deficiencies in income tax against petitioners for the years 1969–71, as follows:

---

| Year | Deficiency |
|------|------------|
| 1969............. | $37,546.60 |
| 1970............. | 37,260.93 |
| 1971............. | 37,290.70 |

The principal issue relates to the amount of depreciation allowable in respect of a building owned by Mr. Fieland.

### FINDINGS OF FACT

Some of the facts have been stipulated, and, as stipulated, are incorporated herein by reference.

Petitioners, husband and wife, filed joint returns for the years in issue. The husband, Mr. Fieland, will sometimes hereinafter be referred to as petitioner. At the time the petition was filed in this case, he resided in Florida; his wife resided in New York.

As more fully hereinafter set forth, petitioner in December 1968 purchased certain property (the property) in Nassau County, N.Y., consisting of a building of some 50,000 square feet and underlying land of approximately 4.75 acres, zoned for light industrial use. The property is on the west side of Route 107, Broadway-Hicksville Road, a major north-south artery. Opposite the property on Route 107 is a large area known as the Grumman Aerospace Complex, which contains the corporate headquarters of Grumman Aerospace Corp. (Grumman), an airport, and various buildings used by Grumman[1] in its business as a producer of military aircraft and related systems, military and commercial seacraft, and spacecraft. Also, in the immediate vicinity of the property are a number of commercial and light industrial facilities. The surrounding community is primarily residential. The property is about 3½ miles from the center of Hicksville.

The building on the property is constructed of masonry and steel, and was erected between 1951 and 1953. It contains approximately 50,000 square feet. Prior to 1967, the property was owned and occupied by the Corydon M. Johnson Co., a publisher of technical manuals for Grumman and other concerns. Grumman also leased space in the building in the early sixties

---

[1] There appear to have been at least several apparently related corporations identified with the Grumman name, and they will be referred to herein either in the aggregate or individually simply as "Grumman." Nothing of consequence, in respect of the tax liabilities for the years in controversy, appears to turn upon which Grumman entity is involved.

for use by its purchasing department. In 1966, Country Capital Corp. (Country Capital), a federally licensed small business investment company, acquired complete ownership of the property in foreclosure proceedings. Petitioner acted as trial counsel for Country Capital in those proceedings.

At the time of foreclosure, the building was a one-story factory and warehouse with a two-story section at the front of the building. Approximately 30,000 square feet of the building was an unfinished factory and warehouse area with concrete floors, exposed block walls, unfinished ceilings, suspended space heaters, and exposed fluorescent lighting. Another approximately 10,000 square feet had been used as office space and had tiled floors, but there were still exposed block walls, unfinished ceilings, suspended space heaters, and exposed fluorescent lighting. The remaining area of approximately 10,000 square feet was office space with tiled floors, finished walls, finished ceilings, and recessed lighting, and was located in the building's two-story section. The building had plumbing facilities to accommodate approximately 165 employees. The parking area adjacent to the building met the then-minimum building code requirements, with space available for approximately 110 cars.

On October 19, 1967, Country Capital leased the property to Grumman for 6 years, but, pursuant to paragraph 54 of the lease, the 6-year term was stated to commence 10 days after the completion of 15 "items" which were to be performed by the lessor as specified in paragraph 53. Rent was stated to be $125,000 per year, and the lessee agreed to pay all real estate taxes as additional rent. At its insistence, Grumman was given an option not only to renew the lease for a term of an additional 5 years at an annual rental of $72,500, but to purchase the property for $750,000 during the fifth and sixth years of the term of the lease.[2] Grumman leased the premises in order to provide office space for engineers working on the lunar module (LEM) used in the Apollo Space Program.

Prior to the completion of the work involved in the 15 items specified in paragraph 53 of the lease, Grumman, in February of 1968, requested that the building be modified to accommodate

---

[2]However, par. 60 provided that the purchase price was to be "increased by the unamortized cost of improvement, in accordance with" a specified formula to the effect that if the option were exercised during the first month of the fifth year, $120,000 was to be added to the purchase price, and thereafter $120,000 "less the aggregate of the number of the succeeding months times $5,000."

an increased personnel force of up to 750 people. Specifically, Grumman requested (i) that changes be made to the interior of the building so as to accommodate up to 750 people, and (ii) that additional parking space on the outside of the building be added to accommodate parking by the increased number of personnel. Accordingly, the lease was subsequently amended on March 18, 1968, by a rider,[3] which modified a number of the provisions of the original lease.

Among other things, paragraph 53 was expanded by the rider to provide for extensive additional work. Items 1 through 15 of that paragraph remained unchanged, but new items 16 through 35 were added. Grumman took possession on April 21, 1968.[4]

Some of the items involved merely ordinary or deferred maintenance, such as cleaning up the premises, painting, repair of the parking area, repairs to roof, repairs to chain link fence and gate, etc. On the other hand, much of the work involved items that were capital in nature, such as the installation of a sprinkler system, battery operated exit lights, air conditioning facilities, expanded toilet and sewage removal facilities, new lighting fixtures, a 3,000-gallon fuel oil tank, metal office partitions, acoustical ceilings, roof exhaust fan, additional paved parking area, plaster-finished lobby wall, doors and frames, drinking fountains, and other items.

The rider also made some important changes in the financial arrangements between the parties. Thus, the annual rent during the initial 6-year term was increased to $163,500, but no change was made in the $72,500 rent payable during the 5-year renewal term. Further, paragraph 59 of the original lease, which established a schedule of payments required of the lessee in the event of the lessee's cancellation of the lease prior to termination of the 6-year term, was revised to include not only all rent

---

[3]Pars. 36 through 60, inclusive, of the original lease as executed Oct. 19, 1967, were contained in an "attachment" to that document, which was designated at that time as a "Rider." The Mar. 18, 1968, document embodying the changes was also designated "rider," and, to avoid confusion, the word "rider" as used herein, unless indicated otherwise, will refer only to the foregoing amendatory provisions of Mar. 18, 1968.

[4]The lease as amended by the rider continued to provide that the 6-year term was to commence 10 days after completion of the items specified in par. 53. However, the record does not disclose when that 10-day period elapsed, and it is assumed, in the absence of any evidence to the contrary, that the 6-year term began on Apr. 21, 1968, when Grumman took possession.

to the end of the year within which notice of cancellation was given, but also additional payments as follows:

| | |
|---|---|
| Within first year | $505,000 |
| Within second year | 404,000 |
| Within third year | 303,000 |
| Within fourth year | 202,000 |
| Within fifth year | 101,000 |
| Within sixth year | None |

Further, although the basic $750,000 price payable by the lessee upon exercising the option to purchase during the fifth and sixth years remained the same, there was an increase in the additions thereto referred to in note 2 *supra*.[5]

The amounts by which the rental during the 6-year term exceeded the rents provided in the renewal period, as well as the additional amounts required to be paid upon premature cancellation of the lease or the exercise of the option to purchase prior to the end of the 6-year period, were all directly related to the estimated expenditures by the lessor in carrying out the work called for by paragraph 53.

On December 20, 1968, petitioner purchased the property from Country Capital subject to the Grumman lease as amended by the rider. On the preceding day, December 19, 1968, apparently in anticipation of the sale to petitioner, Country Capital had mortgaged the property to a bank to secure an indebtedness of $750,000. Petitioner acquired the property subject to the first mortgage obligation. In addition, he paid $261,000 in cash and gave a purchase money note in the amount of $340,000. This original purchase price was thus $1,351,000. The December 20, 1968, purchase agreement gave petitioner an option to require Country Capital to repurchase the property between April 15, 1974, and May 15, 1974, inclusive, "at a consideration of $295,000.00 above the then existing balance of the first mortgage." Such remaining balance at the termination of the 6-year lease period would be $506,792.

In connection with petitioner's purchase of the property, Country Capital represented that the lease and rider were in full

---

[5] The new formula provided for an additional amount of $202,000 if the option were exercised during the first month of the fifth year, and if the option were exercised during any succeeding month of the fifth and sixth years, such additional amount was to be reduced by the number of succeeding months times $8,400.

force and effect, without defense or offset, that Grumman had accepted the premises, and that all rents were on a current basis. However, shortly after purchasing the property, petitioner became aware that Grumman was asserting that the work required by the lease and rider had not been fully performed. Grumman threatened to, and in the early spring of 1969 in fact did, withhold payment of rent. Thereupon, petitioner and Country Capital settled the resulting dispute by having Country Capital lease back the property and assume all rights and obligations to Grumman. The leaseback to Country Capital was on a "net-net" basis, except that petitioner continued to be responsible for the payment of the $97,428 annual charges for interest and amortization of the mortgage indebtedness. The annual rental under this leaseback was fixed at $121,428, and, after subtracting the foregoing $97,428 charges for interest and amortization, there remained an annual return of $24,000 to petitioner on this "net-net" lease. As a further part of the settlement with Country Capital, the latter agreed to "satisfy the [$340,000] note * * * given as a part of the consideration for the original conveyance of the premises" to petitioner, thus reducing his purchase price for the property. Petitioner's cost of the property, as thus revised, was $1,020,440.[6]

As of December 1968, there was a strong likelihood that Grumman would exercise either its option to renew the lease or its option to purchase, and it was more probable that of the two courses of action, it would exercise the option to purchase. The likelihood that it would exercise the option to purchase was enhanced in 1971 when the building ceased being a satellite to the lunar module program and became part of Grumman's training facility; during that year, Grumman added certain further improvements to the building at a cost to it of approximately $300,000.

Within the time specified in the lease, Grumman exercised its

---

[6]If $340,000 is subtracted from the original purchase price of $1,351,000, there remains $1,011,000 as the apparent revised purchase price. However, in their requested findings of fact (petitioner's No. 14 and respondent's No. 44), both parties treated petitioner's purchase price as $1,020,440, and there was no objection to either of those requested findings. Moreover, the $1,020,440 figure is supported by computations made on the basis of figures in pars. 16 and 17 of the stipulation of facts. In the circumstances, the finding is here made that the revised purchase price was $1,020,440. The $9,440 discrepancy between the two possible figures for the purchase price is unexplained; it may possibly be due to payments made by petitioner on the $340,000 note prior to his being relieved of liability thereon, but there is nothing in the record to support such conjecture.

option to purchase the property for $750,000. However, as a consequence of a corporate reorganization of Grumman and the emergence of a new corporate entity, a controversy arose as to whether the particular Grumman entity exercising the option had the right to do so under the lease. Resulting litigation was resolved by Grumman purchasing the property in September 1974 for $850,000.

More than an acre and a half of the property was "excess" land, or land in excess, of what would normally be needed for the operation of the building as a warehouse or for light industrial purposes. Such excess land added a further increment to the overall value of the property if the property were to be used as a warehouse or light industrial facility. There was still excess land when Grumman began to use the property as an office building and training center. In fact, Grumman leased such excess land for employee parking to its next door neighbor, Unity Buying Service, a catalog sales organization that conducts some sort of discount sales operation in conjunction with a warehouse on its premises. In the late 1970's, Grumman ultimately sold the entire property to Unity Buying Service.

Petitioner allocated his $1,020,440 purchase price as follows:

| Land | $300,000 |
|---|---|
| Building | 325,472 |
| Leasehold improvements | 394,968 |

The "leasehold improvements" related to the work performed by Country Capital as required by paragraph 53 of its lease to Grumman. In their returns for 1969, 1970, and 1971, petitioners took depreciation deductions on a straight-line basis (a) in respect of the building based on an estimated life of 40 years; and (b) in respect of the "leasehold improvements" based on an estimated useful life of 57½ months, which represented the claimed remaining period of the Grumman 6-year lease.

In the statutory notice of deficiency, the Commissioner appeared to accept a division of the purchase price among land, building, and leasehold improvements, but he revised the allocations to land and building so that his allocations were as follows:

| Land | $350,000 |
|---|---|
| Building | 275,472 |
| Leasehold improvements | 394,968 |

However, he refused to permit the leasehold improvements to be depreciated over the remaining life of the Grumman lease[7] and required that they be depreciated over the 40-year life of the building.

In an amendment to answer, respondent alleged that the correct basis for the building was $435,000, and the correct basis for the leasehold improvements was $270,440. Thereafter, in an amended petition, petitioners alleged a useful life of no greater than 20 years for the building, and contended further, in the alternative, that (a) they are entitled to exclude from income as a return of capital the portion of the rental that constituted a reimbursement of the cost of the leasehold improvements, or (b) that they are entitled to an amortization deduction of $74,452.72 in respect of the consideration paid, over and above the fair market value of the building and land, for the right to receive a premium rental from the lessee over the initial term of the lease.

## OPINION

The central matter in dispute is whether petitioner is entitled to depreciate the so-called leasehold improvements made by his predecessor, separate and apart from the building itself, and upon the basis of a useful life measured by the remaining initial term of the Grumman lease at the time petitioner purchased the property. The parties appear to be in agreement that the purchase price for the entire property was $1,020,440. Moreover, the Commissioner's determination of deficiency did not disturb petitioner's allocation of $394,968 of that purchase price to the improvements to the property made by petitioner's predecessor in accordance with the requirements of the Grumman lease. However, the Commissioner did not accept petitioner's allocation of the remaining portion of the purchase price between land and building; he increased the cost of the land by $50,000 and decreased the cost of the building by the same amount. The Commissioner accepted the 40-year life for the building which was used in the returns, and he required that the improvements

---

[7]Since petitioner acquired the property on Dec. 20,1968, and the Grumman lease expired Apr. 21, 1974, the remaining life of the Grumman lease would seem to be 5 years and 4 months, or a total of 64 months. However, the Commissioner apparently found it unnecessary to consider this matter in his deficiency notice, since he required the improvements to be depreciated together with the building over the reasonable life of the building without taking into account the extent of the remaining life of the lease.

as well as the building be depreciated over that period. The burden of proof is, of course, upon the petitioners to overcome that determination. *Zimmerman v. Commissioner*, 67 T.C. 94, 104 (1976). To be sure, the Commissioner filed an amended answer in which he increased substantially the amount which he had previously allocated to the building and decreased substantially the amount previously allocated to the improvements. However, the Government's brief indicates that the position thus taken in the amended answer is in substance merely an alternative position which it maintains in the event that it should be unsuccessful in its principal contention. Moreover, the burden of proof, in respect of the new position, is upon the Government, and, as will appear hereinafter, we have concluded that it did not carry that burden. At the same time, we have also concluded that petitioners have not carried their burden of proving that they are entitled to the depreciation deductions taken in their returns or to still further relief claimed by them in an amended petition that alleges not only a remaining useful life of 20 years for the building but also a somewhat more favorable allocation of the purchase price.

We turn at once to the question whether depreciation deductions may be approved on this record in respect of the so-called leasehold improvements separate and apart from the building itself. Plainly, petitioner did not purchase these improvements separately, and there is no indication that any separate value was assigned to such improvements in the purchase agreement, either individually or in the aggregate. Petitioner purchased a single asset, namely, the building as already modified by the improvements. What petitioners are here seeking is sometimes referred to as component depreciation.

Buyers of used real property ordinarily purchase a unified structure, not individual assets, and there cannot be a precise determination of the cost to the purchaser of the individual components of used depreciable property. See *Lesser v. Commissioner*, 42 T.C. 688, 704 (1964), affd. 352 F.2d 789, 790 (9th Cir., 1965), cert. denied 384 U.S. 927 (1966). The situation is to be sharply distinguished from one where the original owner of the property has a building constructed or where he adds improvements to an existing building. In either of such cases, the cost of the individual components is susceptible of precise ascertain-

ment, and depreciation deductions based upon the useful lives of such components have been approved. *Shainberg v. Commissioner*, 33 T.C. 241, 254 (1959); see *Merchants Nat'l Bank v. Commissioner*, 554 F.2d 412, 413 (10th Cir. 1977), affg. a Memorandum Opinion of this Court; *Hastings v. United States*, 279 F. Supp. 13, 19–21 (N.D. Cal. 1967); *University City, Inc. v. Commissioner*, 38 T.C.M. 827, 833 & n. 3, 48 P-H Memo T.C. par. 79,198 at 795–796 & n. 3 (1979). See generally 4 J. Mertens, Law of Federal Income Taxation, sec. 23.46 (1973 rev.). The distinction between new and used property in this respect was the basis for the former administrative practice of the IRS in refusing to allow separate depreciation in respect of existing components of used buildings purchased by the taxpayer. Rev. Rul. 66–111, 1966–1 C.B. 46, 47. To be sure, there has been some relaxation of that position, as reflected in Rev. Rul. 73–410, 1973–2 C.B. 53. But such relaxation was strictly limited. The IRS there recognized "that the component method of accounting for depreciation on used real property improvements may be used if the cost of acquisition is properly allocated to the various components based on their value and useful lives are assigned to the component accounts based on the condition of such components at the time of acquisition." Such standards appear to have been observed in the relatively few instances where component depreciation has been sought in respect of existing improvements to buildings acquired by a taxpayer. *Willits v. Commissioner*, 38 T.C.M. 1152, 1153, 48 P-H Memo T.C. par. 79,294 at 1107 (1979); *Maloney v. Commissioner*, 34 T.C.M. 1237, 1241, 44 P-H Memo T.C. par. 75,286 at 1214 (1975), affd. 566 F.2d 1054 (6th Cir. 1977); *Harsh Investment Corp. v. United States*, an unreported case (D. Ore. 1970, 27 AFTR 2d 71–706, 71–707, 71–1 USTC par. 85,798). *Graves v. Commissioner*, 48 T.C. 7, 14–15 (1967), affd. per curiam 400 F.2d 528 (9th Cir. 1968).

So far as this record discloses, petitioner did not make any allocation of his cost of the improvements among their various components—e.g., the sprinkler system, exit lights, air conditioning, masonry partitions, plumbing facilities, etc. He simply lumped all the improvements together, treating as his cost thereof the aggregate unamortized cost of the improvements in the hands of his predecessor, and then proceeded to depreciate such aggregate amount as his own cost over the alleged remaining life of the Grumman initial 6-year lease. This hardly

satisfied the standards required to be observed in such circumstances.

Certainly, petitioner was not justified in limiting the useful life of the improvements to the remaining period of the 6-year lease, which he fixed at 57½ months, wholly apart from the fact that the 57½-month figure itself was highly questionable (see n. 7 *supra*). A lessor normally is required to depreciate property over its useful life, without regard to the fact that the property is subject to a lease.[8] The length of the lease may be used as the measure of the useful life of the property only if the lessor can establish that there was a "practical certainty" that the property cannot be used in his business after termination of the lease. *Airport Building Development Corp. v. Commissioner*, 58 T.C. 538, 539–540 (1972), quoting from *Lassen Lumber & Box Co. v. Commissioner*, 6 B.T.A. 241, 248 (1927), affd. sub nom. *Lassen Lumber & Box Co. v. Blair*, 27 F.2d 17 (9th Cir. 1928). To establish such a certainty, petitioner must show that the lease would not be renewed by Grumman, and that in this event, no other tenant would be willing to pay for the use of the improvements. See *Airport Building Development Corp. v. Commissioner*, 58 T.C. at 541–543; *New England Tank Industries, Inc. v. Commissioner*, 50 T.C. 771, 780–782 (1968), affd. per curiam 413 F.2d 1038 (1st Cir. 1969); *Ames v. Commissioner*, 36 T.C.M. 1010, 1013–1014, 46 P-H Memo T.C. par. 77,249 at 1013–1014 (1977); *Potter v. Commissioner*, 28 T.C.M. 1190, 1192, 38 P-H Memo T.C. par. 69,227 at 1292 (1969). Most of the improvements appear to us to have a useful life substantially in excess of the initial period of the lease, and we reject the position that they were useful only during Grumman's occupancy. To be sure, there was evidence in support of that position, but we did not find it convincing. Indeed, we had considerable difficulty with the testimony and report not only of petitioner's expert but also of respondent's expert. In our judgment, it was not a foregone conclusion as of the time petitioner purchased the property that Grumman would exercise its option to purchase the property upon termination of the initial term of the lease, even though

---

[8]Sec. 1.167(a)–4, Income Tax Regs., provides as follows:

"Capital expenditures made by a lessor for the erection of buildings or other improvements shall, if subject to depreciation allowances, be recovered by him over the estimated life of the improvements without regard to the period of the lease."

such course did appear to be likely. Moreover, even if it were a certainty that Grumman would exercise its option to purchase, this factor alone would not justify depreciating the improvements over so short a period any more than it would warrant depreciating the building itself over such period—a truly bizarre result, to say the least. Petitioner would still be obliged to prove that the improvements would be valueless at the end of the lease, a showing which has not been convincingly made.

The issue as to the remaining useful life of the building itself gave us considerable trouble. The evidence seemed quite clear that the building had a useful life of 40 years when first constructed in 1953, and some 15 years had passed when petitioner purchased it in 1968. However, we are satisfied that the improvements did much to renovate the building, and there was indeed credible evidence that some of the improvements even increased the life of the structure. We are fully satisfied that petitioners have not carried their burden of proof in respect of the allegation in their amended petition that the useful life of the building was 20 years. The matter is not susceptible of any mathematically precise determination and calls for a practical solution on the basis of the record before us. Using our best judgment, on the entire record, we have concluded, and hereby find as a fact, that the remaining useful life of the building at the time of acquisition by petitioner was 30 years. Moreover, as to the allocation of petitioner's purchase price between land and building, we find unconvincing the conclusions of the experts for both parties, and it is our judgment not only that petitioners have failed to carry their burden of proving that the Commissioner's determination in the deficiency notice was incorrect, but also that the Government has failed to carry its burden of establishing the correctness of a still more favorable allocation alleged by it in the amended answer which in turn was based on the conclusions of its expert.

Petitioners make two new alternative contentions in their amended petition. First, they argue that included in the rent paid by Grumman to petitioner was an amount equal to the cost of the improvements made to the property that should not be treated as rent at all, and should not be included in petitioner's income. We disagree.

Rent is specifically included in the definition of gross income by section 61(a)(5), I.R.C. 1954, and represents payment "for the

occupancy of real estate or the use of personal property." Sec. 1.61–8(a), Income Tax Regs. Payments by the lessee of expenses of the lessor are rental income. Sec. 1.61–8(c), Income Tax Regs. Moreover, advance rentals "must be included in income for the year of receipt." Sec. 1.61–8(b), Income Tax Regs. In this case, both the lease with Grumman and petitioner's lease with Country Capital provided for the payment of "rent." Although there is evidence in the record that the rent for the initial term of the Grumman lease was calculated to return to the lessor the entire cost of the improvements required by Grumman, there is no basis for treating these payments as anything other than compensation for the use of property, or rent.

The improvements in this case were made by the original lessor, Country Capital, and not the lessee, Grumman; hence, the cases cited by petitioners determining that the value of lessee-constructed improvements did not constitute rental income to the lessor are not relevant.[9] Petitioners also rely upon *Beecham, Inc. v. United States,* an unreported case (E.D. Tenn. 1973, 32 AFTR 2d 73–5916, 73–5918, 73–2 USTC par. 82,317, 82,319), which we find to be factually distinguishable. There, the lessee undertook to pay for the cost of special purpose improvements *in one year,* and in the circumstances of that case, it was found that such payments did not in fact constitute rent even though they had been labeled as such. Notwithstanding that the payments herein appear to reflect the cost of the improvements made by petitioner's predecessor, they are in fact rent or advance rentals, includable in income in the year received. See sec. 1.61–8(b), Income Tax Regs.; *Satterfield v. Commissioner,* 34 T.C.M. 872, 874–875, 44 P-H Memo T.C. par. 75,203 at 859 (1975). Cf. *Midler Court Realty, Inc. v. Commissioner,* 61 T.C. 590 (1974), affd. 521 F.2d 767 (3d Cir. 1975).

The second alternate contention is that part of petitioner's purchase price should be allocated to the cost of acquiring a "premium lease," and that he should be entitled to depreciate this amount over the initial term of the lease. That position is contrary to thoroughly considered opinions in at least several cases which hold that a right to receive rents under a lease is not

---

[9]In this connection, petitioners have cited *M. E. Blatt Co. v. United States,* 305 U.S. 267, 277–278 (1938), and *Cunningham v. Commissioner,* 28 T.C. 670, 680–682 (1957), affd. 258 F.2d 231, 232–233 (9th Cir. 1958). In any event, the extent of the authoritativeness of *Blatt* must be considered in the light of the Supreme Court's later decision in *Helvering v. Bruun,* 309 U.S. 461 (1940).

a depreciable asset separable from ownership of real property. *Midler Court Realty, Inc. v. Commissioner*, 61 T.C. at 595 (1974), affd. 521 F.2d 767 (3d Cir. 1975); *Schubert v. Commissioner*, 33 T.C. 1048, 1052–1054 (1960), affd. 286 F.2d 573 (4th Cir.), cert. denied 366 U.S. 960 (1961); *Friend v. Commissioner*, 40 B.T.A. 768, 771–772 (1939), affd. 119 F.2d 959, 960 (7th Cir.), cert. denied 314 U.S. 673 (1941). Petitioners have ignored these cases on brief. Moreover, even conceding that the costs of acquiring a premium lease are amortizable over the life of the lease, petitioners have not demonstrated that such a lease is involved in this case. If there is any premium value to the lease, it must surely arise from an excess of the rent receivable for the term of the lease over the fair rental value of the property. See *Midler Court Realty, Inc. v. Commissioner*, 521 F.2d at 769–770. Petitioners have not shown any such excess, for, even if the payments to amortize the cost of the improvements over the initial term of the lease did represent a premium, petitioners have not shown that these elements were not offset by the value of the renewal option under the lease, since the rental provided in that option, as well as the purchase option price, may have been below market values. See *Midler Court Realty, Inc. v. Commissioner*, *supra*. Cf. also *Schubert v. Commissioner*, 286 F.2d 581–583. The two cases cited by petitioners in support of their position on this point (*Commissioner v. Moore*, 207 F.2d 265 (9th Cir. 1953), cert. denied 347 U.S. 942 (1954); *World Publishing Co. v. Commissioner*, 299 F.2d 614 (8th Cir. 1962)) were distinguished in *Midler Court Realty, Inc. v. Commissioner*, 61 T.C. at 595–596, and have no greater weight here.

--------

A minor and wholly unrelated issue in this case involves the Commissioner's disallowance of a deduction for interest in 1969 to the extent of $2,000. Although petitioners assigned error in their petition as to this adjustment, no evidence was presented in respect thereof at the trial. During the opening statements at the trial, the following colloquy occurred:

THE COURT: May I interrupt you at this point to ask Mr. Fieland whether or not the $2,000 item is in issue here.

MR. FIELAND: I really don't recall—

THE COURT: Do you expect to present any evidence in that connection?

Mr. Fieland: I really didn't realize that there was such an issue. I'll have to look at it, Your Honor.

The Court: Well, I'm asking you now, whether you intend to present any evidence in respect to that.

Mr. Fieland: I don't even know what the item relates to, Your Honor, as of this moment. I will look at the Petition and then inform the Court.

Nothing further was presented at the trial as to this matter, and, in petitioners' opening brief (p. 3) it was stated: "Petitioners concede that no evidence with respect to such interest expense was introduced at the trial, and the Petitioners thus did not sustain their burden of proof on this issue." Thereafter, Mr. Fieland sent to the Court a copy of a letter addressed by him to Government counsel, with enclosures, in which he undertook to show the propriety of the deductions of the full amount of interest claimed in the 1969 return. And petitioners' reply brief makes the contention that the Commissioner's $2,000 adjustment was improper. The argument purports to be supported by an attached photocopy of an alleged bank statement. Wholly apart from possible problems relating to the admissibility of the document into evidence without a proper foundation, the matter is presented entirely too late. Moreover, we can find no justification for any such tardy effort to reopen the record in this manner. The issue relating to this $2,000 item must be decided against petitioners for failure of proof.[10]

A final issue relating to deductions in all 3 years for medical expenses is merely a matter of computation based upon the amounts of adjusted gross income to be determined herein in connection with the—

*Decision to be entered under Rule 155.*

---

[10]Our disposition of this issue does not preclude the Government from conceding the point if it is satisfied on the basis of materials presented to it that petitioners are entitled to the claimed deduction, and such concession could be reflected in the Rule 155 computation. However, we take no position as to whether the Government should follow such course of action. To the extent that the matter is before us for adjudication, petitioners have failed to carry their burden of proof.