LAURENCE S. AMES and JOY A. AMES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ames v. Commissioner
Docket No. 3183-74.
United States Tax Court
T.C. Memo 1977-249; 1977 Tax Ct. Memo LEXIS 194; 36 T.C.M. (CCH) 1010; T.C.M. (RIA) 770249; July 28, 1977, Filed *194 Held, useful life of certain improvements to real property determined. John J. Burke, for the petitioners. Jeffrey C. Kahn, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined a deficiency of $55,673.18 in petitioners' 1970 income tax and a deficiency of $103,298.92 in petitioners' 1971 income tax. The sole issue is the determination of the estimated useful life of certain improvements to real property owned *195 by Laurence S. Ames (hereinafter petitioner). FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. Petitioner and Joy, his wife, were residents of Palos Verdes Estates, California, when they timely filed their income tax returns for 1970 and 1971 and when they filed their petition in this case. Petitioner has been a building contractor and developer for about 27 years. In the last ten years, he has retained ownership of many of the buildings he has constructed, including some low income housing, portions of shopping centers, office buildings, and convalescent hospitals. In 1966, petitioner learned that the State of California wanted to buy facilities for a new state social program initiated by Governor Brown. One of the purposes of this program was to establish social service centers in poverty areas. The state intended to sublet space in these centers to other agencies, federal, county, city, and private, so social services could be provided for the poor in their own neighborhoods. It was thought that the scattered locations of these individual agencies discouraged use by the people who need them the most. When Governor Reagan took office, *196 he ordered that the program be scaled down, reduced the proposed centers from 13 to 7, and indicated that the program would have two years to prove itself. He directed that no lease on facilities that housed a service center should exceed two years. Petitioner was informed that the state wanted to lease facilities for the centers from private owners. He found two suitable pieces of property. State officials showed interest, and so petitioner obtained options to purchase the real estate. One piece of property, in the East Los Angeles area, was about 5 acres in size. There were some old buildings on the property. This property was owned by Cedars of Lebanon-Mount Sinai Hospitals of the Los Angeles Jewish Medical Center. Petitioner exercised his option on the 5-acre tract because the state was increasingly interested in it. It was the only site in the area which was big enough to accommodate a facility containing 50,000 square feet, the minimum floor space the state needed. The buildings then on the property did not contain 50,000 square feet of floor space; accordingly, the state agreed with petitioner that he would construct the necessary facilities which the state would *197 lease. The state became aware that it could not lease the proposed facilities for only two years because it was unlikely that a developer could obtain financing to build a structure in the area with only a two-year lease commitment. The state authorities decided that, in all probability, the state would have to lease the facilities for a minimum of five years at fifty cents a square foot. The state prepared plans describing the needed improvements. Some smaller buildings were to be razed, two larger buildings were to be remodeled, two new office buildings were to be constructed, and parking lots were to be graded. When petitioner received copies of the state's plans, he estimated the costs of construction. He was able to estimate how much money he would have to borrow to finance the project and estimate the amount of rent the state would have to pay. A complicated series of negotiations ensued among petitioner, the lender, and the state. When petitioner approached the lender and explained his project, the lender was willing to lend money because the state was the lessee. However, the lender required that the improvements be paid for over the period of the lease. The parties *198 determined that a five-year lease at fifty cents a square foot per month could not produce enough revenue to enable petitioner to pay for the improvements. The state would not increase the rent; it agreed, however, to a 5-1/2 year lease. It was thought that enough revenue would be generated at fifty cents per square foot per month to pay for the improvements. The 5-acre tract was zoned R-2. This zoning classification was a residential classification; there could be no more than two residences on any lot. Petitioner accordingly had to obtain a zoning variance. The variance was granted. It allowed the establishment, operation, and maintenance of a State of California Department of General Services, service center for vocational habilitation, social welfare, employment and administrative activities. The variance also allowed the housing of various other city, county, and federal agencies and the creation of about 182 parking spaces. On or about September 22, 1967, petitioner bought the 5-acre tract from Cedars of Lebanon-Mount Sinai Hospitals for $400,000. Petitioner constructed all improvements on this tract strictly in accordance with the state's plans. The state's lease *199 as finally amended was from February 1, 1969 to July 31, 1974, at a monthly rental of $39,146.76. The state was given the option at the termination of the lease either to renew the lease for 10 years at approximately $.17 per square foot per month or purchase the property for $725,000. Eldon Christman, who negotiated the lease for the state, would have preferred a lease in excess of 5-1/2 years, but was prohibited from negotiating a longer lease because of the program limitations discussed above. The 5 acres fronts on Bonnie Beach Place, which dead ends on the north side of the property. A ravine runs along the west side of the property. There are slums to the south and west of the acreage. The property is in the middle of an older, residentially zoned, area and is a substantial distance from any commercially zoned area. The nearest commercially zoned area is on Brooklyn Avenue, about five or six blocks south of the property. Brooklyn Avenue has a very old commercial strip; most of the buildings on this strip were built in the 1920's and 1930's with some buildings from the 1940's. The nearest commercial property to the north appears to be in the area of City Terrace Drive, *200 which is farther away than Brooklyn Avenue. It is difficult to get to this area from the property in question because Bonnie Beach Place is a dead end street to the north. The City Terrace Drive area has only a few small stores and markets. There are no major shopping centers within several miles of the 5-acre tract. The 5-acre tract could not be used legally for any purpose except as originally zoned (residential) or as noted in the variance which petitioner obtained (as a service center). Any other use would be an illegal use unless a zoning exception could be obtained. When petitioner acquired the 5-acre tract, he thought about erecting low income housing on the property upon termination of the state's lease.Although such a use would be residential, it does not conform precisely to the requirements of an R-2 zone. After petitioner's attorney made inquiries of county officials, petitioner concluded that he was practically assured of a variance.
At no time during petitioner's negotiations with the state nor up to the time he filed his 1971 return, was petitioner advised by any state official that the state would or would not renew the lease or purchase the property under *201 the state's option. When negotiating the lease, petitioner discussed with Eldon Christman, the state's leasing officer, the possibility of the state exercising its option. Christman advised petitioner that there was not a probable likelihood that the state would renew the lease or purchase the property.The state's option to renew the lease or to purchase the property was inserted in the lease at the state's request, not at petitioner's request. The option to renew at a much lower rental rate would allow the state to enjoy the improvements to the property that it, in effect, paid for during the initial term of the lease. The state made it perfectly clear to petitioner that it had paid for the improvements during the initial term of the lease and was not about to pay for them again during the renewal option period. Petitioner made no improvements to the property not included in the plans, which, as noted above, were drawn up by the state, not petitioner. The state sublet parts of the various structures to different federal, county, and city agencies. When petitioner filed his income tax returns for 1970 and 1971, he had no way of knowing whether the social service program would *202 succeed or fail. No one had such knowledge. ULTIMATE FINDING OF FACT The useful life of the improvements involved in this case is 32 years. OPINION Section 167(a) [1] provides as follows: There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)-- (1) of property used in a trade or business, or (2) of property held for the production of income. Respondent determined that petitioner's depreciation deduction for certain property was excessive. The reason for this is simple. Petitioner calculated that the useful life of the property was 6 years and 2 months while respondent determined that the useful life was 32 years. Obviously the deduction will be less for any given year if it is spread over 32 years rather than 6 years and 2 months. In short, we must determine the useful life of the property so that the proper depreciation deduction can be calculated. The determination of useful life is a factual question. Radio Station WBIR, Inc. v. Commissioner,31 T.C. 803, 817 (1959). *203 Respondent's determination is presumptively correct. Zimmerman v. Commissioner,67 T.C. 94, 104 (1976). The reasonableness of any claim for depreciation shall be determined upon the basis of conditions known to exist at the end of the period for which the return is made. Sec. 1.167(b)-0(a), Income Tax Regs.; Western Terminal Company v. United States,412 F. 2d 826 (9th Cir. 1969). Useful life is defined in section 1.167(a)-1(b), Income Tax Regs., as "not necessarily the useful life inherent in the asset but * * * the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income." This regulation further provides as follows: This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (3) the climatic *204 and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. Salvage value is not a factor for the purpose of determining useful life. If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. However, estimated remaining useful life shall be redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination. * * * Section 1.167(a)-9, Income Tax Regs., provides in part as follows: The depreciation allowance includes an allowance for normal obsolescence which should be taken into account to the extent that the expected useful life of property will be shortened by reason thereof. Obsolescence may render an asset economically useless to the taxpayer regardless of its *205 physical condition. Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes. Among these causes are normal progress of the arts and sciences, supersession or inadequacy brought about by developments in the industry, products, methods, markets, sources of supply, an other like changes, and legislative or regulatory action. In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in computing such estimated useful life, a change to a new and shorter estimated useful life computed in accordance with such showing will be permitted. No such change will be permitted merely because in the unsupported opinion of the taxpayer the property may become obsolete * * *. The taxpayer must show that his estimate of useful life is a reasonable one. Western Terminal Company, supra, and cases cited therein. Petitioner argues that he erected special purpose buildings for a single tenant. He submits that the specialized nature of the improvements rendered them useless to any other tenant, that zoning *206 restrictions legally prohibited any other use, and that the improvements were in an area making them completely unsatisfactory to any other tenant. He further contends that, although the physical life of the buildings may have been more than 6 years and 2 months, the tenant occupying the facilities could have been reasonably expected to occupy the facility for only 6 years and 2 months. [2] In short, petitioner argues obsolescence.
Obsolescence is the antithesis of depreciation based upon wear and tear; it rests ultimately on disuse rather than use. Dunn v. Commissioner, 42 T.C. 490, 494 (1964). It affords a taxpayer the opportunity to recover the cost of an asset if he sustains the burden of proving that depreciation deductions for wear and tear will be insufficient to restore to him the basis of an asset. The depreciation deduction based upon wear and tear will be insufficient to restore to the taxpayer the basis of the asset because its life has been shortened. The asset is useless for performing the function it once served. Southeastern Building Corp. v. Commissioner, 3 T.C. 381, 389 (1944), *207 affd. 148 F. 2d 879 (5th Cir. 1945), cert. denied 326 U.S. 740 (1945). See Zimmerman v. Commissioner, supra at 104-107. We must first determine the "normal" useful lives of the buildings, that is, the life they would have if obsolescence were not a consideration. Dunn v. Commissioner, supra at 494. Once we have established the normal useful lives, we will determine whether those lives should be any shorter because of obsolescence. Respondent's determination that the normal useful lives of these buildings is 32 years must be sustained. As petitioner candidly admits on brief, he did not introduce any evidence directed at proving the normal useful lives of the buildings in question. We find nothing arbitrary in respondent's determination that the normal useful lives of the buildings should be 32 years. Having determined that the normal useful lives of the buildings are 32 years, we can now determine whether these buildings became obsolete before 32 years. As stated above, petitioner contends (1) that the improvements involved herein were improvements suitable to only one tenant and (2) that it was reasonable *208 to expect that this tenant would use the facility for only 6 years and 2 months. The first step in the argument is certainly valid. Petitioner constructed or renovated buildings for the State of California for use in a social service program. There is competent testimony to show that the buildings were useless unless employed for that specific purpose. Furthermore, any other use was prohibited by zoning restrictions. [3] Finally, the improvements were in a slum area far from commercial areas. Even if the improvements were suitable for other tenants (which they were not), we suspect it would have been very difficult to get other tenants. The second step in petitioner's argument is that the State of California could reasonably be expected to occupy the buildings for only 6 years and 2 months. We disagree. Petitioner contends that the social service program was a temporary one and that the state's leasing officer, Eldon Christman, told him that it was probably unlikely that the state would *209 renew its lease. Actually the program was not a temporary one. What the Reagan administration said was that the program had a certain time within which to prove itself. If it was successful, it would, we assume, continue. If it was a failure, it would not. As stated above, the reasonableness of a claim for depreciation is determined upon the basis of conditions known to exist at the end of the period for which the return is made. When petitioner filed his returns for 1970 and 1971, he had no way of knowing whether the program would succeed or fail. He, of course, resolved the doubt in his favor by assuming failure, thus providing a shorter useful life. While this is understandable in human terms, it does not conform with the law. Petitioner has the burden of proving that a shorter life than that caused by normal wear and tear--32 years--is in order. For 1970 and 1971, he lacked the necessary information to sustain his burden. [4] Accordingly, respondent's determination must be sustained. The testimony of Eldon Christman, the state's leasing officer, does not help petitioner. He told petitioner that there was not a probable likelihood that the state would renew the lease. *210 Unfortunately there is no evidence on the record to indicate why Christman thought the state would not renew. As stated above, the program had a certain amount of time to prove itself. If it was successful, then assumedly the state would renew the lease since petitioner's property was the only suitable one in the area.The key, however, was the success or failure of the program. During the years in issue (shortly after the program started) it is the simple truth that noone knew whether the program would succeed or fail. Eldon Christman's statement concerning renewal seems to have no basis in fact. If there is some reason why he thought the state would not renew, it is certainly not explained on the record. *211 Because of a concession by respondent, Decision will be entered under Rule 155. Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. The 6 year 2 month period is a combination of a 5-1/2 year lease and 8 months early occupancy.↩
3. There is some evidence that petitioner could have the property rezoned for low income housing. Nevertheless, the buildings as they existed were not suitable for low income housing.↩
4. In Airport Building Development Corp. v. Commissioner, 58 T.C. 538, 542 (1972), we held that in order to meet his burden of proof in an obsolescence case, a taxpayer must "demonstrate that there existed a reasonable certainty that the economic useful life of the leasehold improvements would end with the expiration of the initial [leasehold] term." [Emphasis added.] It is possible the Court of Appeals for the Ninth Circuit, where this case is appealable, requires that taxpayers satisfy a lesser test, one of proving to a "reasonable approximation" the existence and amount of obsolescence. See Western Terminal Company, supra at 827, directing attention to the rule of Burnet v. Niagara Falls Brewing Co.,282 U.S. 648, 655↩ (1931). On the facts before us, petitioner is unable to meet either test and is therefore unable to satisfy his burden of proof.