UNIVERSITY CITY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
University City v. Commissioner
Docket No. 3600-73.
United States Tax Court
T.C. Memo 1979-198; 1979 Tax Ct. Memo LEXIS 324; 38 T.C.M. (CCH) 827; T.C.M. (RIA) 79198; May 21, 1979, Filed *324 Held, respondent's determinations as to the useful life of various components of a shopping center sustained. Gary Randall and Thomas B. Tilford, for the petitioner. Robert J. Chicoine and Darrell Hallett, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioner's income taxes in the amounts of $13,602.79 and $16,773.59 for the taxable years 1969 and 1970, respectively. Petitioner filed a petition for the year 1970 only, instituting a refund suit in Federal District Court for the year 1969. Therefore, we have only 1970 before us. The deficiencies are based primarily upon respondent's determination that the useful *325 lives of components of a shopping center owned by petitioner are longer than reported by petitioner on its returns for those years. The parties have distilled respondent's determination to result in two issues: (1) whether respondent erred in recomputing the depreciation claimed by the petitioner on its income tax return for the year 1970 by allocating certain of the component costs to subcomponents thereof which were determined to have a useful life equal to the useful life of the building shell, and (2) whether the useful life of the building shell is 40 years as originally determined by petitioner, 45 years as determined by respondent in the notice of deficiency, or 30 years as claimed by petitioner in its original and amended petitions? [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, along with attached exhibits, are incorporated herein by this reference. *326 University City, Inc., is a corporation with its principal office in Spokane, Washington. It reports income using the accrual method of accounting on a calendar year basis, and it filed its corporate income tax return for 1970 with the District Director of Internal Revenue for the District of Washington. On August 1, 1965, petitioner completed construction of the University City Shopping Center (hereafter University City or Center), located near Spokane, Washington, at a cost of $2,355,659. This figure did not include the cost of the land or the cost of a previously constructed supermarket (Rosauer's) and drug store (Thrifty) which had been constructed in 1959 and incorporated into the shopping center. Located adjacent to the shopping center is a Crescent department store which was constructed in latter 1970. The shopping center is located at the intersection of Sprague Avenue and University Road. This location is the approximate population center of East Valley, a rapidly growing suburban residential area. Sprague Avenue is a major east-west arterial about one mile south of, and parallel to, interstate highway 90. The site of the Center is about 17 acres, rectangular *327 in shape, and bounded on the east by University Street, on the north by Sprague Avenue, on the south by the Chicago Milwaukee Railroad right-of-way, and on the west by the Crescent department store. University City is designed with a large retail store on each end of the center (the east and west side) and smaller retail outlets located between them. The two large retail stores are Newberry's on the east and Penney's on the west, connected by an enclosed, airconditioned mall. Rosauer's is adjacent to Newberry's at the eastern portion of the center. When originally constructed, the Center contained 191,052 square feet of retail space; of this, Newberry's occupied 35,000 square feet and Penney's occupied 42,000 square feet. University City was in 1970, and was at the time of trial, the dominant shopping center in a rapidly growing commercial and residential area. It is well maintained and managed and is in a desirable retail location. It has a history of minimal vacancies and a long list of retail operations seeking tenancy at the Center. The tenants at the Center are for the most part satisfied retailers who believe the Center is of good quality, well-designed and well-managed. *328 It has been successful from the beginning. Its profits and the profits of its tenants have been increasing substantially year by year. Gross receipts at University City have increased from $446,875 in 1970 to $631,133 in 1975. In comparison to nine other shopping centers in the Spokane area, University City has consistently ranked first or second in terms of profitability and has been one of the most successful shopping centers in the central and eastern portion of the State of Washington. *tThe Center's principal tenants and the terms of their original leases were as follows: Date of
Original
Square Tenant
Original Lease
Lease Term
Footage
Rosauers
10/59
15 yrs.
30,000
Thrifty Drugs
9/60
15 yrs.
9,000
J.C. Penney's
10/63
15 yrs.
from 8/1/65
56,000
Newberry's
1963
20 yrs.
from 8/1/66
45,750
4-B's Cafe
4/64
10 yrs.
from 8/1/65
8,400
The original leases for Penney's and Newberry's each provided options to extend for two additional fiveyear terms. When originally planned, the shopping center was to be built in three stages. The first stage was to build the shopping center as it stood during 1970 and at the time *329 of trial. The second stage envisioned an increase in the Center's size from 191,052 to 231,902 square feet through the construction of additional retail space contiguous to Penney's to be occupied by Crescent or some other department store. The third stage was to be an expansion of Penney's by the addition of a second floor, and possibly the addition of a second floor to Newberry's. There was no specific timetable for these subsequent stages of expansion. In approximately 1969, the owners and developers of University City decided not to build a department store immediately adjacent to Penney's because of problems which caused them to modify their original concept. They decided instead to place the Crescent department store at a distance from Penney's, giving the Center three major tenants apart from one another so that traffic could be drawn from tenant to tenant, thereby benefiting the smaller stores in between. In pursuance of this new plan, in about 1969, the owners and developers of University City released an option which they held to purchase the six-acre tract to the west of the Center, to allow Crescent to acquire the property for the construction of a department store *330 building. Construction was completed in latter 1970. The owners of University City hoped that subsequent to the construction of Crescent, they would be able to connect Crescent and Penney's with an air-conditioned, covered mall. Apparently, Penney's has been slow in taking action with respect to expansion plans. Petitioner believes that Penney's recalcitrance has been for reasons other than those stated in discussions with petitioner (insufficient parking). Also, petitioner fears that Penney's would move from University City to a new center if one is constructed. However, the J.C. Penney Company at University City has at no time given any specific indication that it wished to leave the Center or that it was opposed to the concept of expansion of the Center from Penney's to the Crescent department store; rather, it has indicated a desire to enlarge its store at University City by expanding to a second floor and in correspondence on at least two occasions, representatives of Penney's indicated that an expansion of the shopping center from Penney's to the site of the Crescent department store was a mutually beneficial plan of development. In 1970 and 1971, petitioner purchased *331 several large parcels of property to the south of the Center behind the Chicago Milwaukee Railroad right-of-way because of the possibility of expansion of the Center. At approximately the same time, petitioner purchased additional land to the northwest of the site of the Center for additional parking in connection with the contemplated expansion of the Center, and to eliminate Penney's stated objection to expansion plans. Penney's and Newberry's are situated in such a way as to permit access from the mall and the parking lot. Both have second floor storage areas and Penney's has a 22,000 square foot basement. The stores along the back side of the mall are 150 deep and those along the front are 80 feet deep. The basic structure consists of concrete and steel. The exterior walls are constructed of concrete masonry units with vertical and horizontal reinforcing steel and various exterior treatments including brick and stone and ceramic tile over the concrete block. The store fronts are steel framed and use a variety of glass and other materials. The partitions between the stores are concrete block, and within each store there are wood frame or sheetrock and other finishes appropriate *332 to the area. The heating and air conditioning system is comprised of combined gas heating and electric air conditioning units. These units are located on the roof of the Center with the exception of Newberry's which has a large builtup system and a mechanical room. The distribution system of the heating and air conditioning component is made up of fiberglass ducts with an aluminum exterior which distributes the air generated throughout the entire Center. This particular system had been recommended to the architect and owners of University City as it was considered adequate for the needs of the shopping center. Some difficulties were experienced with the duct work at the time of installation, however, as a result of taping procedures.Nonetheless, the duct work was inspected at the time of construction and any problems resulting from improper taping procedures were repaired. Although there were no apparent problems with the duct work of the air conditioning system at University City at the time of trial, industry experience indicates that erosion occurs in fiberglass duct work. A significant portion of the plumbing component at University City is comprised of a fire extinguishing *333 sprinkler system which is located above the interior ceiling of the Center. The system consists principally of a network of piping and sprinkler heads. The sprinkler head is held together by solder and should a fire start the solder melts thus causing the sprinkler head to open which activates the system. There has not been any functional obsolescence in the sprinkler system installed at University City over the period of its existence. When the remodeling of retail stores such as those located at University City occurs, changes in the sprinkling system are relatively minor. Additionally, if expansion of the Center should take place, either in the form of a new Mall area between Penney's and Crescent, or in the form of space on the second floor of Penney's, the existing system would not be affected to any great extent. The basic piping, as it exists in the Center, will have a useful life from 40 to 75 years, although when tenant space is remodeled, it may, at times, be necessary to abandon existing piping and to install new piping. The electrical system at University City consists of three main distribution points. One is located at Newberry's, one at Penney's, and one distribution *334 point exists for all of the small shops and restaurants along the mall between these two major tenants. The Newberry's and Penney's distribution points are fed from an overhead service line located outside the building. The distribution point for the remaining retail shops is fed by an underground service line to a bank of transformers. From the bank of transformers, the electrical service goes to the main distribution point, then to major switch panels and finally through the conduit to individual stores and subpanels. From the sub or service panels, wires run through the conduit to the fixtures located in the store. The electrical system also runs to the lighting posts in the parking lot. The underground conduits of the electrical system are made of polyvinyl chloride and have an indefinite physical life. It is a general code requirement that an electrical system in a commercial building or shopping center such as University City have, at the time of construction, a capacity over and above that which is necessary to service immediate tenancy. Therefore, if the minimum code requirements are met at the time the system is constructed, the usage of electricity may be increased *335 by 15 percent and still be within the capability of the system. Tenant changes and remodeling sometimes require abandonment of electrical panels and wiring. However, if Penney's expands to a second floor as anticipated, the only change necessary would be to add additional service conduits feeding the distribution center without the necessity of relocating or altering the existing distribution system. Additionally, certain remodeling jobs (for instance where a tenant wishes to remodel his retail space but will continue to use the wall where an electrical service panel is located) do not require that the service panel be abandoned but only that it be relocated to a different part of the store. Similarly, if tenant changes require new fixtures to be installed in approximately the same location as old fixtures, none of the electrical conduits or wiring would be affected. In computing its depreciable base for the shopping center, petitioner allocated the costs of construction among various component parts of the Center. This allocation, made by petitioner when the Center was placed in service, was as follows: Useful Life
Cost
in Years
Electrical components $ 314,688.56
15
Ceilings
62,646.97
10
Plumbing
275,679.61
25
Heating & Air Condi-
Tioning
191,078.14
15
Building Shell
1,380,748.74
40
Roofing
57,584.00
20
Asphalt for Roofing
43,846.00
10
Sewage Plant
29,387.00
25
Total
$ 2,355,659.02
*336 Petitioner used these cost allocation and useful life figures when computing depreciation for income tax purposes on its Federal income tax returns for each of the years 1965 through 1970. The category "electrical components" is made up of two sub-categories, "electrical fixtures" and "electrical panels and wiring." The $314,688.56 spent by petitioner on the electrical components was comprised of $87,357.54 spent on fixtures and $227,331.02 spent on panels and wiring. Similarly, the ceiling category is made up of two sub-categories, "acoustical panels" having a cost of $25,058.79 and "suspension system" having a cost of $37,588.18. The $275,679.61 which petitioner allocated to plumbing components is comprised of fixtures costing $36,091.97, piping costing $144,367.90 and a sprinkler system costing $95,219.74. Finally, of the $191,078.14 allocated to the heating and air conditioning components, $99,360.63, was allocated to the controls, heating and air conditioning units, and $91,717.51 to the air ducts and framework. In connection with the financing of the Center in 1964, the lending institution involved utilized the services of a real property appraiser, Lawrence Shorrett, *337 MAI, who prepared a lengthy report which, among other things, concluded that the economic useful life of University City was 50 years. Respondent's agent, when reaching his conclusions as to useful life, considered, among other things, Shorrett's determination of a 50-year economic useful life. Total capital expenditures at University City since its inception through 1975, in addition to the original cost of the Center, approximated $168,000.Of this amount, at least $123,500 was for the construction of completely new and separate facilities having nothing to do with alterations, remodeling or abandonment of components and subcomponents presently in issue. In the statutory notice of deficiency, respondent redetermined petitioner's depreciation by (1) dividing the components as shown on petitioner's return into their subcomponents and assigning a useful life and cost to each subcomponent; and (2) determining that the building shell had a useful life of 45 years as opposed to the 30-year life which petitioner claimed on its 1969 and 1970 returns. The results of respondent's determination and a comparison of that determination with the useful life figures used by petitioner on its *338 return is set forth below: As Determined
As Used by
Cost
By Respondent *
Petitioner
Electrical components: Fixtures $ 87,357.54
15
15
Panels & Wiring
227,331.02
45
15
Ceiling components: Acoustical panels
25,058.79
10
10
Suspension system
37,588.18
45
10
Plumbing components: Fixtures $ 36,091.97
25
25
Piping
144,367.90
45
25
Sprinkler System
95,219.74
45
25
Heating & Air
Conditioning: Controls, heating & air
conditioning units $ 99,360.63
15
15
Air ducts and framework
91,717.51
45
15
Building Shell
$1,380,748.74
45
40 **
Roofing
57,584.00
20
20
Asphalt for Parking
43,846.00
10
10
Sewage Plant
29,387.00
25
25
Total
$2,355,659.00
OPINION The questions which we must address are (1) whether the useful lives of various components of the shopping center complex were as determined by respondent or as *339 reported by petitioner on its 1970 income tax return and (2) whether the useful life of the building shell component of petitioner's shopping center was as determined by petitioner or otherwise. Determination of University City's useful life and the reasonableness of petitioner's depreciation deductions are questions of fact. Matson Navigation Co. v. Commissioner,67 T.C. 938, 944 (1977); Casey v. Commissioner,38 T.C. 357, 381 (1962). Respondent's determination as to the amount of depreciation for the year in issue is presumptively correct and the burden of proof rests with the petitioner. Bell Electric Co. v. Commissioner,45 T.C. 158, 167 (1965); Dunn v. Commissioner,42 T.C. 490, 494 (1964). The first area of disagreement pertains to the allocation of costs between certain component parts of the University City Shopping Center. As is the case with the second issue, the issue here is one of useful life. With respect to useful life, section 1.167(a)-1(b), Income Tax Regs., states as *340 follows: (b) Useful life. For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. * * * The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. However, estimated remaining useful life shall be *341 redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination. Petitioner emphasizes a number of factors in attempting to carry its burden of proving its depreciation figures correct. First, petitioner argues that the person who originally determined the appropriate depreciation, both in terms of allocation and component groupings, was an expert in this respect. Second, petitioner points to the useful lives assigned to various component parts of a shopping center in Shainberg v. Commissioner,33 T.C. 241 (1959), a case which based its findings, in part, upon the lease terms of a shopping center's tenants and the need to remodel space when new tenants move in. Petitioner asserts that the major tenant leases at University City were short in duration and that a change in major tenant would require extensive remodeling and component changes. Petitioner intimates that Penney's would leave University City should the opportunity arise and that its position as one of the leading shopping centers in Spokane is being threatened due to the prospect of increasing competition. Third, petitioner emphasizes *342 the fact that as this remodeling occurs, components which have a remaining physical life are often abandoned due to the higher cost of attempting to reuse them in the remodeled space. Petitioner also identified physical and economic obsolescence in the duct work making up the heating and air conditioning system. It is obvious that the mere fact an expert initially determined the useful lives of the various components is, standing alone, insufficient to carry petitioner's burden of proof. However, when coupled with other factors, this fact does aid petitioner in its task. Petitioner's other arguments all rest on the same theme: economic obsolescence. Economic obsolescence occurs when a business or income-producing asset becomes economically useless, regardless of its physical condition. This is, of course, a permissible consideration in determining useful life. Sec. 1.167(a)-9, Income Tax Regs.; Zimmerman v. Commissioner,67 T.C. 94, 106 (1976). Since economic obsolescence is defined in terms of usefulness to petitioner, it must establish with reasonable certainty that the components of the shopping center will have little or no *343 value at the end of the useful life selected. See Zimmerman v. Commissioner,supra at 107. On its return, petitioner allocated costs among the various components as set forth in the findings of fact. Apparently, in determining the useful life of a given component, petitioner assigned that component a useful life based on the life of its subcomponent with the shortest useful life. In the notice of deficiency, respondent further divided the various components into their subcomponents and assigned a useful life to each of those subcomponents, agreeing with petitioner on some subcomponets but determining that others had the same useful life as the building shell. The parties have agreed that each component is made up of the various subcomponents with the cost allocation as determined by respondent. For instance, in the case of "electrical components," petitioner assigned a 15-year useful life. Respondent determined that "electrical components" were made up of two subcomponents: "fixtures" and "panels and wiring." To each of these subcomponents, respondent assigned a useful life based upon an allocation of the total cost of the overall component. As we see *344 it, the problem with petitioner's case in support of its original determinations as to the useful life of the various components is that it is founded upon the conclusory opinion of an expert and hypothetical occurrences (anticipated competition and remodeling). An allowance cannot be made for obsolescence merely because it is the taxpayer's opinion that the property may become obsolete at some later date. Rather, as previously noted, it must be shown that the property in question is or will be affected by economic conditions that will result in its being abandoned at a date prior to the end of its normal useful life. Sec. 1.167(a)-9, Income Tax Regs. While petitioner has identified a few situations in which economic obsolescence may occur, its case is founded upon hypothesis.The end result is that we cannot determine that the assets in question will become obsolete prior to the estimated date of physical exhaustion. Since a reasonably definite date cannot be ascertained, there are no means of determining what is a reasonable allowance for economic obsolescence. *345 Columbia Malting Co. v. Commissioner,1 B.T.A. 999 (1925). [2]
In other words, petitioner has not quantified its assertions of economic obsolescence to a point where they can be translated into an effect upon physical useful life. Thus, petitioner has not shown that its useful life determinations are correct as it is its burden to do. No attempt was made to substantiate its useful life figures beyond generalities concerning factors which have an effect on useful life. And, as pointed out by respondent, petitioner's proof, assuming the original accuracy of its determinations, should have been easy at the time *346 of trial. The Center was put into service in 1965. The trial was held in 1976 and no evidence was adduced relating to those components which, under petitioner's depreciation schedule, either were to have been obsolete at that time (ceilings) or in the near future (electrical, heating and air conditioning). See Robins & Weill, Inc. v. United States,382 F.Supp. 1207 (M.D.N.C. 1974). [3]
With respect to the second issue, petitioner argues that the building shell component had a useful life of 30 years when placed in service. The 30-year useful life is a modification of the useful life of 40 years which petitioner originally *347 claimed with respect to the shell. Respondent, on the other hand, determined that the shell had a useful life of 45 years when placed in service. Petitioner relies upon cases which have assigned useful lives to shopping centers. Those cases, petitioner argues, support its position in two related ways: first, they empirically support its position, and second, their emphasis on the lease terms of the major tenants support its downward adjustment of useful life. Additionally, petitioner asserts that certain new factors not apparent in 1965 came to light in 1970, primarily the inability to expand, which provided the catalyst for the change in the useful life of the building shell. Respondent relies on section 1.167(a)-1(b), Income Tax Regs., and argues that petitioner has not shown, clearly and convincingly, a change in useful life. Respondent also relies on the presumptive correctness of his determination of 45 years with respect to petitioner's original 40-year useful life figure. Petitioner's task with respect to this second issue can be considered in two parts: its burden of proof to sustain the original useful life claimed with respect to the *348 building shell, and its task to clearly and convincingly show a significant change in useful life to 30 years. We believe petitioner has not sustained its burden with respect to its original 40-year useful life, and, a fortiori, has not clearly and convincingly shown a significant change in useful life to the 30 years it now alleges. Petitioner has not contested, as such, respondent's determination that University City will have a physical useful life of 45 years. However, it argues that the structure's economic life is significantly shorter. [4]
*349 The recent case of Zimmerman v. Commissioner,67 T.C. 94 (1976), provides a comprehensive discussion of economic obsolescence and its impact on useful life. Pertinent to the issue now before us, we stated in Zimmerman at 107: * * * that to sustain his burden with respect to a deduction for obsolescence petitioner must show both that the properties are becoming obsolete and that they will be obsolete. Put another way, petitioner must prove what the normal useful lives of the buildings are and that each will become obsolete prior to the expiration thereof.James D. Dunn, supra, at 494. Furthermore, a reduction in or an absence of profits is not sufficient to sustain a deduction for obsolescence. Detroit & Windsor Ferry Co. v. Woodworth,115 F.2d 795 (6th Cir. 1940). Nor are declining values due to economic conditions. State Line & Sullivan R. Co. v. Phillips,98 F.2d 651 (3rd Cir. 1938), cert. denied 305 U.S. 635 (1938). On brief, petitioner concludes: In the final analysis, we have a shopping center which does *350 not fit into any particular classification. It is, at best, an 'oversized community center,' which has parking problems. It faces uncertain competition, and competition will reduce the economic life of a center if it cannot expand to meet that competition. Expansion of University City is difficult due to the railroad boundary to the South, and made even more difficult by the problems with J. C. Penney. It appears that petitioner relies on these elements to support downward adjustment of useful life from 40 to 30 years and, alternatively, to support its original 40-year determination. However, the basis which petitioner uses to support its useful life determinations, as opposed to those of respondent, is precisely that which we admonished against using in Zimmerman, that is, loss of economic advantage. And the factor which makes the result in this case clearer than was the case in Zimmerman is that in Zimmerman, the taxpayer could actually show a loss of economic advantage.In the case before us, any loss in economic advantage is only hypothetical, based on perceived inadequacies of University City relative to some, as yet unconstructed, center to be built in the *351 future. Because this is insufficient to support a deduction for obsolescence, respondent's determination must stand. Decision will be entered under Rule 155. Footnotes
1. The parties have agreed that if the Court's determination of useful lives differs from that reported by petitioner on its original income tax return, previously allowable depreciation with respect to such components will be allocated in the ratio of their respective costs.↩
*. Respondent used the same useful life petitioner used in each category for part of the subcomponent, but determined that those remaining should have the same useful life as the building shell -- 45 years. ** Petitioner used 40 years on its tax returns but now claims 30 years.↩
2. In Columbia Malting it was stated at 1001: In order that the taxpayer may be entitled to the obsolescence deduction in the years involved, there must have been substantial reasons for believing that the assets would become obsolete prior to the end of their ordinary useful life, and second, it must have been known, or believed to have been known, to a reasonable degree of certainty, under all the facts and circumstances, when that event would likely occur.↩
3. Petitioner cites Shainberg v. Commissioner,33 T.C. 241 (1959), as support for the propriety of its use of component depreciation. However, respondent here does not question the propriety of petitioner's use of component depreciation, but rather its application. Shainberg↩ did not deal specifically with the application of component depreciation, i.e., the useful lives of the various components; rather, it dealt only with the issue of whether respondent properly changed the taxpayer's method from component to composite.
4. Also, as previously stated, petitioner relies on several cases which have allowed the lease terms of the major tenant of a shopping center to greatly influence the determination of the Center's useful life. Hill v. Commissioner,63 T.C. 225 (1974); Fort Walton Square v. Commissioner,54 T.C. 653 (1970); and Wauwatosa Colony, Inc. v. Commissioner,T.C. Memo. 1966-51. We believe each of these cases is factually distinguishable from that now before us. In Hill, we held in favor of petitioner's contention that the shopping center in issue had a remaining useful life of 19 years as opposed to the 33-1/3-year figure contended for by respondent. Apparently overlooked by petitioner was the fact that original useful life was not in issue in Hill. The opinion in Hill does not indicate what the original useful life of the shopping center was except to the extent that the center was completed in 1959 and that as of September 1, 1964, we agreed with petitioner that it had a remaining useful life of 19 years (the date on which the center was sold to the taxpayers therein and others). Additionally, and more importantly, was the size of the center therein which was made up of 12 stores, the major tenant of which was a supermarket. It does not appear that the center in issue in Hill was comparable to University City. In Fort Walton Square, the petitioner originally estimated a 40-year useful life for the shopping center there in issue. On subsequent returns, a 25-year useful life was utilized. Respondent determined a 40-year useful life was proper. Testimony at trial indicated that the useful life of a concrete hollow brick building of the type there in issue was 20 to 25 years. This Court determined a 30-year useful life to be appropriate based largely on the 20-year lease of the major tenant in the center, reasoning that the major tenant, to whose specifications the buildings were constructed, would not have a building constructed which had a useful life so close to the length of its lease. Thus, the lease term of the major tenant was used to extend what otherwise would have been the useful life of the center. Again, these facts are too distinguishable from those now before us to lend support to petitioner's argument. Finally, in Wauwatosa Colony,↩ where we found a 30-year useful life appropriate, the shopping center there in issue was not of a size comparable to that of University City. The shopping center there in issue was a neighborhood center having only five stores and a total square footage of 20,101.